UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
                                    :
NELLY NUNEZ,
                                    :
                    Plaintiff,            16 Civ. 5078 (HBP)
                                    :
     -against-                            OPINION
                                    :     AND ORDER
NANCY A. BERRYHILL,
COMMISSIONER OF SOCIAL SECURITY,[1]  :

                    Defendant.       :

------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/11/17

          PITMAN, United States Magistrate Judge:

I.   Introduction

          Plaintiff Nelly Nunez brings this action pursuant to

Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C.

§ 405(g), seeking judicial review of a final decision of the

Commissioner of Social Security (the "Commissioner") denying her

application for disability insurance benefits ("DIB").   The

parties have consented to my exercising plenary jurisdiction

pursuant to 28 U.S.C. § 636(c).   Plaintiff and the Commissioner

have both moved for judgment on the pleadings pursuant to Rule

12(c) of the Federal Rules of Civil Procedure.   For the reasons

_____

     [1]Nancy A. Berryhill, who became the acting Commissioner of
Social Security on January 23, 2017, is substituted as the
defendant in this action in place of Carolyn W. Colvin.   See
Fed.R.Civ.P. 25(d).

set forth below, plaintiff's motion (Docket Item ("D.I.") 12) is granted and the Commissioner's motion (D.I. 14) is denied.

II. Facts[2]

A. Procedural History

Plaintiff filed an application for DIB on January 11, 2013, alleging that she had been disabled since January 19, 2011 (Tr. 172-78). Plaintiff completed a "Disability Report" in support of her claim for benefits (Tr. 189-96). Plaintiff claimed that she was disabled due to, inter alia, "severe impairments to the neck, both shoulders [and] both knees" and pain in her right wrist as a result of a February 2009 car accident (Tr. 44, 190). Plaintiff reported that she took Advil and oxycodone for pain (Tr. 192). She also reported that she previously had surgery on her knees, left shoulder and right wrist (Tr. 194).

On March 1, 2013, the Social Security Administration (the "SSA") denied plaintiff's application, finding that she was not disabled (Tr. 119-27). Plaintiff timely requested and was granted a hearing before an Administrative Law Judge (an "ALJ").

---

[2]I recite only those facts relevant to my resolution of the pending motions. The administrative record that the Commissioner filed, pursuant to 42 U.S.C. § 405(g) (see SSA Administrative Record, dated July 26, 2016 (D.I. 11) ("Tr.")) more fully sets out plaintiff's medical history.

2

ALJ Robert Gonzalez held a hearing on April 17, 2014 (Tr. 32-107). The ALJ reviewed the claim de novo and, in a decision dated October 24, 2014, determined that plaintiff was not disabled within the meaning of the Act from January 19, 2011 to the date of the decision (Tr. 13-27). The ALJ's decision denying benefits became final on April 28, 2016 when the Appeals Council denied plaintiff's request for review (Tr. 1-3). Plaintiff commenced this action on June 28, 2016 seeking review of the Commissioner's decision (Complaint, dated June 28, 2016 (D.I. 1)).

B.  Plaintiff's
    Social Background

Plaintiff was born in 1969 and was 43 years old at the time she filed her application for DIB (Tr. 172). Plaintiff completed two years of college but did not earn a degree (Tr. 39-40, 191). Plaintiff previously worked as a police officer for the New York City Police Department (the "NYPD") (Tr. 43-44, 191, 210-11). She retired from the NYPD, receiving a non-disability monthly pension of approximately $2,900.00 (Tr. 40-41). In 2012, plaintiff received a settlement of approximately $1.25 million for a February 2009 auto accident that gave rise to her injuries (Tr. 44-45).

3

At her hearing before the ALJ, plaintiff testified that she lived alone with two dogs (Tr. 49). She stated that she took care of the dogs herself, letting them out in the backyard instead of walking them (Tr. 50-51). Additionally, plaintiff testified that she was able to drive by herself, but could not drive for one and one-half hours without taking a break (Tr. 52-53, 57-59). Plaintiff spent most of her time at home, but she was able to shop for groceries (Tr. 53). She also socialized with her friends twice a week, meeting them either at a diner or at her house (Tr. 53-54). Plaintiff testified that she traveled to Puerto Rico with friends for a few days in 2012 (Tr. 51-52).

C. Plaintiff's
   Medical Background

   1. Medical Records that Pre-Date
      the Relevant Time Period

A magnetic resonance image (an "MRI") of plaintiff's lumbosacral spine was taken in February 2010 (Tr. 279). It showed a left foraminal[3] herniation at L3-L4[4] impinging upon the

---

[3]A foramen is "a natural opening or passage, especially one into or through a bone." Dorland's Illustrated Medical Dictionary ("Dorland's") 729 (32nd ed. 2012).

[4]L3 and L4 refer to vertebrae of the spine.

The spinal column is comprised of four regions. The cervi-
(continued...)

4

exiting L3 root with mild biforaminal stenosis,[5] a midline annular tear at L4-L5 with thecal sac[6] indentation and mild bilateral foraminal stenosis and a right parasagittal[7] herniation at L5-S1 impinging upon the originating S1 root with mild canal and bilateral foraminal stenosis (Tr. 279).

Beginning in March 2010, plaintiff sought treatment from Dr. Kevin Wright, an orthopedic surgeon, for pain in her right wrist, left shoulder, right knee, neck and back (Tr. 243).

---

[4](...continued)
cal region is located at the part of the spine closest to the skull and is made up of vertebrae C1 to C7 (C1 is located closest to the skull). Anatomy of the Human Spine, Mayfield Brain & Spine, https://www.mayfieldclinic.com/PE-AnatSpine.htm (last visited Aug. 11, 2017). The thoracic region is located below the cervical region and is made up of vertebrae T1 to T12 (T1 is located closest to the skull). Anatomy of the Human Spine, supra. The lumbar region is located below the thoracic region and is made up of vertebrae L1 to L5 (L1 is located closest to the skull). Anatomy of a Spine, supra. Finally, the sacral region is located below the lumbar region and is made up of vertebrae S1 to S5 (S1 is located closest to the skull). Anatomy of the Human Spine, supra.

[5]Stenosis is "an abnormal narrowing of a duct or canal." Dorland's at 1769.

[6]The thecal sac is a "fluid-filled bag that contains the nerves along the spine." Yu v. Astrue, 963 F. Supp. 2d 201, 207 n.17 (E.D.N.Y. 2013).

[7]The sagittal is a "vertical plane passing through the standing body from front to back." Medical Definition of Sagittal, MedicineNet.com, http://www.medicinenet.com/script/main/art.asp?articlekey=9284 (last visited Aug. 11, 2017).

5

In April 2010, he performed an arthroscopy[8] on plaintiff's left shoulder (Tr. 286-87). The arthroscopy revealed that plaintiff had tears and an impingement in that shoulder (Tr. 286). In September 2010, Dr. Wright performed an arthroscopy on plaintiff's right knee (Tr. 280-81). That procedure disclosed that plaintiff had a tear in the knee, chondromalacia[9] and synovitis[10] (Tr. 280). He also performed an arthroscopy on plaintiff's right wrist in November 2010 (Tr. 282-83). That arthroscopy showed that plaintiff had tears and synovitis in that wrist.

Plaintiff also saw Dr. Paul Brisson, an orthopedic surgeon, on June 9, October 13 and December 13, 2010 (Tr. 348-60). During these appointments, plaintiff complained of cervical and lumbar pain (Tr. 348-60).

---

[8]An arthroscopy is the "examination of the interior of a joint with an arthroscope." Dorland's at 158. An arthroscope is used to carry out diagnostic and therapeutic procedures within the joint. Dorland's at 158.

[9]Chondromalacia refers to "softening of the articular cartilage." Dorland's at 352.

[10]Synovitis is inflammation of a synovial membrane. Dorland's at 1856. The condition is "usually painful, particularly on motion, and is characterized by a fluctuating swelling." Dorland's at 1856.

2. Medical Records for
the Relevant Time Period

a. 2011

i. Dr. Brisson

Plaintiff saw Dr. Brisson on March 14, 2011 for cervical and lumbar pain (Tr. 361). On that date, plaintiff complained of pain that radiated to her left arm, with numbness and tingling in her left hand that made it difficult for her to hold objects (Tr. 361). Dr. Brisson assessed cervical instability, cervical spondylosis[11] at C5-C6 and lumbosacral spondylosis without myelopathy[12] (Tr. 361).

On May 17, Dr. Brisson performed a micro-discectomy[13] fusion at C5-C6 for a disk herniation with associated radiculopathy[14] (Tr. 363). In follow-up consultations in June and August, plaintiff reported an improvement in her symptoms,

---

[11]Spondylosis refers to dissolution of a vertebra. Dorland-'s at 1754.

[12]Myelopathy refers to "any of various functional disturbances or pathological changes in the spinal cord." Dorland's at 1220.

[13]During a discectomy, an intervertebral disc is excised. Dorland's at 526, 547.

[14]Radiculopathy is a "disease of the nerve roots, such as from inflammation or impingement by a tumor or a bony spur." Dorland's at 1571.

although she continued to experience pain at the base of her neck that radiated into both shoulders (Tr. 365-67). However, her numbness and tingling had subsided (Tr. 365-67). During these appointments, Dr. Brisson recommended that plaintiff attend physical therapy (Tr. 365-67).

In September, plaintiff reported minimal pain at the base of her neck and occasional stiffness (Tr. 368). Dr. Brisson recommended that plaintiff stay as active as possible and continue attending physical therapy (Tr. 368). In November, plaintiff reported that she still had some residual neck pain "specific to rotation to the right side" and occasional stiffness (Tr. 369). Dr. Brisson also noted that plaintiff's movement was "still slightly apprehensive" (Tr. 369). Dr. Brisson again recommended that plaintiff stay as active as possible and continue attending physical therapy (Tr. 369).

## ii. Dr. Wright

Plaintiff also continued seeing Dr. Wright in 2011 for her right wrist, right knee and left shoulder. In February and March, Dr. Wright reported that plaintiff was attending physical therapy and that she reported improvement in her symptoms (Tr. 423, 426). In March, plaintiff reported that she had returned to the gym and lost weight, which reduced her knee pain (Tr. 426).

8

From May through September, Dr. Wright reported that
sensation in plaintiff's right wrist was intact (Tr. 429, 432,
434). Additionally, the wrist had a range of motion of 90
degrees on flexion,[15] 80 degrees on extension,[16] 80 degrees on
supination,[17] 80 to 85 degrees on pronation,[18] 18 to 28 degrees on
radial deviation[19] and 40 to 42 degrees on ulnar deviation[20] (Tr.
429, 432, 434, 436). With respect to plaintiff's right knee, her
range of motion was 0 to 130 degrees,[21] and the knee was stable

---

[15]Flexion refers to bending. Dorland's at 717. Normal
flexion of the wrist is 60 degrees (Tr. 455).

[16]Extension refers to "the movement that straightens or
increases the angle between the bones or parts of the body."
Dorland's at 662. Normal extension of the wrist is 60 degrees
(Tr. 455).

[17]In the wrist, supination refers to "the act of turning the
palm forward (anteriorly) or upward, performed by lateral rota-
tion of the forearm." Dorland's at 1804. Normal supination of
the wrist is 80 degrees (Tr. 455).

[18]In the wrist, pronation refers to "the act of turning the
palm posteriorly (or inferiorly when the forearm is flexed),
performed by medial rotation of the forearm." Dorland's at 1526.
Normal pronation of the wrist is 90 degrees (Tr. 455).

[19]During radial deviation, the wrist is tilted toward the
thumb side of the hand. See Dorland's at 503. Normal radial
deviation of the wrist is 20 degrees (Tr. 455).

[20]During ulnar deviation, the wrist is tilted toward the
pinky side of the hand. See Dorland's at 503. Normal ulnar
deviation of the wrist is 30 degrees (Tr. 455).

[21]Normal flexion of the knee is 135 to 150 degrees and
normal extension is 0 degrees (Tr. 456).

(Tr. 429, 432, 434, 436). Plaintiff's range of motion in her left shoulder was 80 to 170 degrees on forward elevation, 40 to 50 degrees on external rotation and L5 to T10 on internal rotation[22] (Tr. 429, 432, 434, 436). Dr. Wright also opined that plaintiff had a "temporary total disability" (Tr. 266, 268).

In July and September, plaintiff also complained of pain in her neck and cervical spine that radiated down to both arms (Tr. 434, 436). Moreover, the cervical spine was tender (Tr. 434, 436). Dr. Wright diagnosed plaintiff with cervical radiculopathy (Tr. 435, 437).

On October 20, 2011, plaintiff told Dr. Wright that she had been experiencing pain in her left knee for approximately two and one-half weeks (Tr. 438). An x-ray revealed mild to moderate arthritic changes in the knee (Tr. 438). During that appointment, as well as during subsequent appointments, plaintiff had an antalgic gait and used a cane (Tr. 438-40). She also had tender-

---

[22]Normal forward flexion of the shoulder is 180 degrees, normal extension is 50 degrees, normal abduction is 180 degrees, normal adduction is 50 degrees, normal external rotation is 90 degrees and normal internal rotation is T8 to T10 (Tr. 454-55). Unlike flexion, extension, abduction, adduction and external rotation, internal rotation can be measured in terms of vertebrae (Tr. 454-55); see footnote 4, supra. This is accomplished by the patient placing her hand behind her back. Stacie J. Fruth, Fundamentals of the Physical Therapy Examination: Patient Interviews and Tests & Measures 263 (2d ed. 2018).

ness and effusion[23] in the knee, as well as a positive McMurray's test[24] (Tr. 438-40). The range of motion in the left knee was 0 to 100 degrees (Tr. 438-39).

An MRI of the knee taken on November 17 showed a tear of the posterior horn of the medial meniscus, minimal lateral patellar subluxation,[25] joint effusion and a popliteal cyst[26] (Tr. 440). After an injection of medication provided only temporary relief, plaintiff elected to have an arthroscopy performed on her left knee (Tr. 439-40).

### b. 2012

#### i. Dr. Brisson

On March 3, 2012, Dr. Brisson noted that plaintiff was recovering from her pre-surgical symptoms "very progressively" and doing well in rehabilitation (Tr. 370). Plaintiff denied any

---

[23]Effusion is "the escape of fluid into a part or tissue." Dorland's at 595.

[24]A McMurray's test is used to diagnose a torn meniscus. Dorland's at 1894.

[25]A subluxation is "an incomplete or partial dislocation." Dorland's at 1791.

[26]A popliteal cyst, also known as a Baker cyst, occurs when there is "swelling behind the knee, caused by escape of synovial fluid which becomes enclosed in a membranous sac." Dorland's at 458, 460.

type of tingling or numbness in her arms (Tr. 370). She still had some residual stiffness and minimal residual pain "specific to rotation to the right side," and plaintiff's "movement [was] still slightly apprehensive when it [came] to rotation" (Tr. 370). Plaintiff reported that she attended physical therapy and treated her pain with Advil (Tr. 370). Dr. Brisson once again recommended that plaintiff stay as active as possible and continue attending physical therapy (Tr. 370).

On April 18, plaintiff complained of pain on the left side of the base of her neck, with spasms into the shoulder (Tr. 371). Plaintiff reported that she was trying to stay active and was taking Advil for pain (Tr. 371). Dr. Brisson opined that plaintiff was "totally disabled" from her previous occupation (Tr. 371).

On May 2, plaintiff visited Dr. Brisson for an "urgent consultation" (Tr. 372). She reported that she had tripped and fell a few weeks prior to the appointment and was experiencing severe neck pain that radiated into her cervical spine, with a feeling of disorientation or dizziness (Tr. 372). Dr. Brisson diagnosed plaintiff with severe acute exacerbation of neck pain and prescribed Vicodin (Tr. 372). Dr. Brisson referred plaintiff for a neurological consultation (Tr. 372), though there is no evidence that she ever followed up with a neurologist.

### ii.  Dr. Wright

Dr. Wright performed an arthroscopy on plaintiff's left knee in January 2012 (Tr. 284). After the arthroscopy, plaintiff reported a lessening of her knee pain with the help of physical therapy (Tr. 441-445). While the knee's range of motion improved, it was still tender (Tr. 442-46).

### iii.  Dr. Govindlal Bhanusali

In connection with the February 2009 accident, Dr. Govindlal Bhanusali conducted an independent medical examination of plaintiff on July 11, 2012 (Tr. 531). He noted that plaintiff walked into the examination without a limp or assistive device (Tr. 531). Upon an examination of the cervical spine, the active range of motion was 50 out of 50 degrees on flexion, 50 out of 60 degrees on extension, 60 out of 60 degrees on side bending and 60 out of 80 degrees on side rotation (Tr. 536). Plaintiff reported pain on her left side with extension and rotation (Tr. 536).

Dr. Bhanusali also examined plaintiff's shoulders. There was mild tenderness of the left shoulder but no tenderness of the right shoulder (Tr. 536). The right shoulder had a normal active range of motion (Tr. 536). The active range of motion in

13

the left shoulder was 170 out of 180 degrees on flexion, 30 out

of 30 degrees on extension, 170 out of 180 degrees on abduction,[27] 30 out of 30 degrees on adduction,[28] 45 out of 60 degrees on

external rotation and T10 out of T7 on internal rotation (Tr.

536). Neer's impingement sign[29] and Hawkins impingement sign[30]

were negative for both shoulders (Tr. 536).

Upon an examination of the right wrist, there was mild

tenderness (Tr. 536). The active range of motion was 70 out of

70 degrees on dorsiflexion, 60 out of 70 degrees on volar[31]

flexion, 30 out of 30 degrees on radial deviation and 20 out of

30 degrees on ulnar deviation (Tr. 536). Plaintiff reported pain

on volar flexion and ulnar deviation (Tr. 536). She reported no

pain in her left wrist, and she had a full active range of motion

---

[27]Abduction is the movement of a body part away from the body's midline. See Dorland's at 26.

[28]Adduction is the movement of a body part towards the body's midline. See Dorland's at 26.

[29]The Neer's test is used to "identify impingement of the rotator cuff." Paz v. Commissioner of Soc. Sec., 15 Civ. 6353 (AJN)(DF), 2017 WL 1082684 at *4 n.9 (S.D.N.Y. Feb. 1, 2017) (Freeman, M.J.) (Report & Recommendation) (internal quotation marks omitted), adopted by, 2017 WL 1078573 (S.D.N.Y. Mar. 20, 2017) (Nathan, D.J.).

[30]The Hawkins sign is a diagnostic technique used to identify, among other things, impingement and rotator cuff tears. Martinez v. Colvin, 13 Civ. 7254 (KPF), 2015 WL 4041988 at *2 n.2 (S.D.N.Y. July 2, 2015) (Failla, D.J.).

[31]Volar refers to the palm. Dorland's at 2070.

in that wrist (Tr. 536). Plaintiff's grip strength was 55 pounds

of force in her right hand and 80 pounds of force in her left

hand (Tr. 536). Tinel's[32] and Phalen's[33] sign were negative (Tr.

536).

An examination of the lumbosacral spine revealed no

muscle spasms and mild tenderness (Tr. 537). Its range of motion

was 50 out of 70 degrees on active flexion, 30 out of 30 degrees

on extension, 30 out of 30 degrees on side bending and 30 out of

30 degrees on side rotation (Tr. 537).

Finally, an examination of both knees revealed mild

tenderness, a normal range of motion and no instability (Tr.

537). McMurray's and Lachman's[34] testing were both negative (Tr.

537).

Dr. Bhanusali diagnosed plaintiff with a soft tissue

injury of the cervical spine, left shoulder, right wrist and both

knee joints (Tr. 537). Dr. Bhanusali opined that plaintiff could

perform modified work that did not require lifting more than 15

---

[32]A positive Tinel's sign "indicates a partial lesion or the beginning regeneration of the nerve." Dorland's at 1716.

[33]A positive Phalen's sign indicates carpal tunnel syndrome. Dorland's at 1714.

[34]A Lachman's test is used for "cases of severe knee injury." Dorland's at 1893. It tests for tears of the anterior cruciate ligament. Key v. Commissioner of Soc. Sec., No. 13-CV-364 (SLT), 2014 WL 1338311 at *5 n.7 (E.D.N.Y. Mar. 31, 2014).

15

pounds and that plaintiff should avoid overhead activities with the left shoulder and bending, pushing, pulling, squatting, kneeling and strenuous physical activities (Tr. 538). He also noted that plaintiff was capable of performing the activities of daily living and that she did not require any durable medical equipment (Tr. 538).

### c. 2013

#### i. Dr. Jose Corvalan

At the request of the SSA, Dr. Jose Corvalan performed a consultative examination of plaintiff on February 5, 2013 (Tr. 295). Plaintiff reported to Dr. Corvalan that she did "very light cooking," "very light cleaning" if she was able to do it, laundry once a month and shopping every two weeks as needed (Tr. 296). Plaintiff stated that she received some help performing these activities from her family (Tr. 296). Plaintiff was also able to shower and dress herself every day, watch television, listen to the radio, read and socialize with friends (Tr. 296).

Upon a physical examination, Dr. Corvalan noted that plaintiff's gait was normal, but that she was not able to walk on her heels and toes because of pain in her knees (Tr. 296). Plaintiff did not need an assistive device, nor did she need help

getting on or off the examination table (Tr. 296-97). Moreover, she was able to rise from a chair without difficulty (Tr. 297).

Plaintiff's hand and finger dexterity were intact (Tr. 297). On a scale of five, plaintiff's grip strength was a four in her right hand and a five in her left hand (Tr. 297). She was able to zip, button and tie all of her articles of clothing (Tr. 297).

Upon an examination of plaintiff's shoulders, Dr. Corvalan noted that their range of motion was 90 degrees on forward elevation, 90 degrees on abduction and full range on adduction, internal rotation and external rotation (Tr. 297). Plaintiff's range of motion in her right wrist was 40 degrees on dorsiflexion, 60 degrees on volar flexion and 10 degrees on radial deviation and ulnar deviation (Tr. 297). Her range of motion in the left wrist was 60 degrees on dorsiflexion, 70 degrees on volar flexion, 20 degrees on radial deviation and 30 degrees on ulnar deviation (Tr. 297). The right wrist and left shoulder were both tender on palpation (Tr. 297). Dr. Corvalan noted that there was no joint inflammation, effusion or instability (Tr. 297). Plaintiff's strength in her arms was a five on a scale of five, and there was no muscle atrophy or sensory abnormality (Tr. 297).

An examination of plaintiff's cervical spine revealed that plaintiff's range of motion was 30 degrees on flexion, extension and lateral flexion (Tr. 297). Dr. Corvalan noted that there was no pain or spasms during this examination (Tr. 297).

Upon an examination of plaintiff's lumbar and thoracic spine, Dr. Corvalan noted that plaintiff had some limitation in flexion and extension because of pain in her knees (Tr. 297). There was full lateral extension and rotary movement bilaterally, and there was no tenderness or spasms (Tr. 297).

Finally, Dr. Corvalan examined plaintiff's knees (Tr. 298). On flexion and extension, plaintiff's range of motion in her right knee was 90 degrees and her range of motion in the left knee was 60 degrees (Tr. 298). On a scale of five, the right knee had a strength of five and the left knee had a strength of four (Tr. 298). There was tenderness on palpation and swelling of both knees, although the tenderness and swelling in the left knee was more severe (Tr. 298). There was no muscle atrophy (Tr. 298).

Dr. Corvalan assessed plaintiff with pain in her neck, both knees, right wrist and left shoulder, as well as a limited range of motion in both shoulders (Tr. 298). He opined that plaintiff had moderate limitations for moving her neck forward, backward and bilaterally (Tr. 298). He also opined that plain-

18

tiff had a mild limitation for reaching up, reaching out, reach-
ing back or lifting any heavy objects because of a limited range
of motion in both shoulders (Tr. 298). Additionally, plaintiff
had a mild limitation for holding or lifting any heavy objects
with the right hand because of a limited range of motion in the
right wrist (Tr. 298). Finally, he opined that plaintiff had a
moderate limitation for standing, walking, bending, climbing
stairs, kneeling, lifting and carrying any heavy objects due to
pain in both knees (Tr. 298-99).

### ii. Seaport Orthopaedic Associates

Plaintiff began treating with Seaport Orthopaedic
Associates in April 2013. On April 2, she saw Dr. Marc Levinson
for neck pain and numbness/tingling and weakness in her right
hand (Tr. 346). Dr. Levinson noted that plaintiff had a dimin-
ished range of motion on her right side and full lumbar flexion
and extension (Tr. 346). Dr. Levinson prescribed physical
therapy and several medications, including Percocet (Tr. 346).

On April 9, an electromyography ("EMG")[35] was performed of plaintiff's arms (Tr. 344-45). Dr. Jean Bachar reported that the test showed a right ulnar neuropathy[36] at the elbow (Tr. 345). There was also evidence of bilateral C7/C8 radiculopathy, but Dr. Bachar found the radiculopathy difficult to confirm because of plaintiff's history of cervical spine fusion (Tr. 345). A physical examination revealed that plaintiff was able to walk without an assistive device, and her gait was symmetric and non-antalgic (Tr. 344). There was tenderness in the cervical paraspinal muscles bilaterally, and plaintiff's range of motion was limited due to pain and a history of surgery (Tr. 344). Plaintiff's strength was a five on a scale of five in both arms, and sensation was intact (Tr. 344). A Spurling's test[37] was negative, as were Tinel's and Phalen's signs (Tr. 344).

Plaintiff was involved in another car accident on May 4, 2013, for which she sought medical attention at an emergency

---

[35]An EMG is an "electrodiagnostic technique for recording the extracellular activity (action potentials and evoked potentials) of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation." Dorland's at 602.

[36]Neuropathy is "a functional disturbance or pathological change in the peripheral nervous system, sometimes limited to noninflammatory lesions as opposed to those of neuritis." Dorland's at 1268.

[37]A Spurling's test is used to diagnose cervical radiculopathy. Dorland's at 1900.

room (Tr. 379-92).[38] She then saw Dr. Bachar on May 30 for complaints of worsening pain since the accident (Tr. 339). She reported that her pain was a nine on a scale of ten, but that the medications the hospital prescribed were effective (Tr. 339). Dr. Bachar noted that the range of motion in plaintiff's cervical spine had decreased since the previous examination, sensation in the median nerve distribution of the right arm had decreased and strength in the right arm decreased to five minus on a scale of five (Tr. 339). Dr. Bachar diagnosed plaintiff with cervical radiculopathy and renewed plaintiff's prescription for Percocet (Tr. 339). She also indicated that plaintiff was partially disabled and "75% impaired" (Tr. 339).

Plaintiff returned to Dr. Bachar on July 2; her chief complaint at that time was neck pain radiating to her arms (Tr. 338). Plaintiff also complained of left knee pain (Tr. 338). A right shoulder impingement sign was positive, and the range of motion of the cervical spine was restricted (Tr. 338). Plaintiff's gait was "slow and shuffling" (Tr. 338). Additionally, her strength in the right arm was a four on a scale of five due

_____

[38]During that visit, plaintiff complained of neck and left knee pain (Tr. 380, 385). On examination, plaintiff had a normal range of motion with no tenderness (Tr. 386). Her left knee was stable without effusion (Tr. 386). She was discharged in good condition, with prescriptions for two medications, Ultram and Robaxin (Tr. 381, 387).

21

to pain, and sensation was intact throughout the arms (Tr. 338).
In addition, a Spurling's test was positive on the right side
(Tr. 338). Dr. Bachar assessed internal derangement[39] of the
knee and cervicalgia[40] (Tr. 338).

### iii. Dr. Wright

Plaintiff returned to Dr. Wright on May 31, 2013 with
complaints of trauma to her left knee, left wrist and cervical
spine; plaintiff claimed she sustained the trauma in the May 2013
accident (Tr. 326). Dr. Wright noted that plaintiff had a normal
gait (Tr. 327). The range of motion in the left knee was 0 to
100 degrees (Tr. 327). Plaintiff had tenderness in that knee,
though the knee was stable (Tr. 327). Plaintiff's left wrist was
mildly tender to palpation, with a range of motion of 90 degrees
on flexion, 80 degrees on extension, 90 degrees on supination, 90
degrees on pronation, 12 degrees on radial deviation and 30
degrees on ulnar deviation (Tr. 327). Plaintiff experienced
tenderness with radial deviation (Tr. 327). She also had tender-

---

[39]A derangement is "disarrangement of a part or organ."
Dorland's at 493. An internal knee derangement refers to a
"partial dislocation of the knee, marked by great pain and spasm
of the muscles." Dorland's at 493.

[40]Cervicalgia is a general term that describes neck pain.
Smith v. Colvin, No. 12-CV-5573, 2013 WL 4519782 at *4 n.21
(E.D.N.Y. Aug. 26, 2013).

ness with motion of the cervical spine and a positive mild Spurling's test bilaterally (Tr. 327). Dr. Wright assessed left knee and wrist contusions and a cervical sprain, and he prescribed physical therapy (Tr. 327-28).

Plaintiff saw Dr. Wright again on June 28 with complaints of pain in both shoulders, right elbow and cervical spine (Tr. 324). Dr. Wright noted that plaintiff's left knee had improved and that physical therapy was benefitting plaintiff (Tr. 324). A physical examination of the knee revealed that its range of motion was 0 to 110 degrees, and there was decreased tenderness (Tr. 324). Upon an examination of her shoulders, plaintiff was able to elevate forward to 170 degrees and rotate internally to L1 with both shoulders and rotate externally to 62 degrees with the left shoulder and 68 degrees with the right shoulder (Tr. 324). Plaintiff was tender over the anterior aspect of the glenohumeral joint,[41] and an O'Brien's test[42] was positive (Tr. 324). Dr. Wright assessed bilateral shoulder pain that was possibly an internal derangement, a cervical sprain and left knee and wrist contusions (Tr. 324). Dr. Wright recommended physical

[41]The glenohumeral joint is located between the shoulder blade and the humerus. Dorland's at 783.

[42]The O'Brien's test "is a test for injury to the supraspinatus muscle or superior labrum of the shoulder joint." Dettmer v. Astrue, No. 4:10-CV-1329 (CEJ), 2011 WL 3904429 at *5 n.17 (E.D. Mo. Sept. 6, 2011).

therapy, and he ordered an MRI of plaintiff's shoulders (Tr. 325).

On July 11, an MRI was taken of plaintiff's shoulders (Tr. 322-23). The MRI of plaintiff's left shoulder revealed a labral tear and the MRI of plaintiff's right shoulder revealed limited tendinosis,[43] bursitis[44] and a labral tear (Tr. 322-23).

Plaintiff attended physical therapy for her injuries (Tr. 320). On July 18, plaintiff reported to Dr. Wright that her right shoulder and left knee remained "significantly painful," but that she saw improvement in her left shoulder (Tr. 320). On examination of the left knee, its range of motion was 0 to 100 degrees, with tenderness (Tr. 320). On examination of the right shoulder, plaintiff was able to elevate forward to 140 degrees, rotate externally to 50 degrees and rotate internally to L1 (Tr. 320). She had a positive Neer's impingement sign, Hawkins impingement sign and O'Brien's test (Tr. 320). On examination of the left shoulder, plaintiff was able to elevate forward to 160 degrees, rotate externally to 64 degrees and rotate internally to

---

[43]Tendinosis, also known as tendinopathy, is a pathologic condition of a tendon. Dorland's at 1881.

[44]Bursitis is inflammation of the bursa, which is a "sac or saclike cavity filled with a viscid fluid and situated at places in the tissues at which friction would otherwise develop." Dorland's at 262, 264. Bursitis is "occasionally accompanied by a calcific deposit in the underlying tendon." Dorland's at 264.

T10 (Tr. 320). Dr. Wright assessed internal derangement of the
left knee and both shoulders and a left knee contusion (Tr. 320).
Dr. Wright ordered an MRI of the left knee and more physical
therapy for the left shoulder (Tr. 321). He also noted that
plaintiff's right shoulder was not improving with conservative
treatment (Tr. 321).

An MRI of plaintiff's left knee was taken on August 19
(Tr. 314). It revealed osteoarthritis,[45] a tear of the medial
meniscus, anterior cruciate ligament scarring, a "medial collat-
eral ligament sprain, medial retinacular sprain"[46] and joint
effusion (Tr. 314-15).

Plaintiff underwent an arthroscopy on her right shoul-
der on August 26 (Tr. 316). On September 19, plaintiff reported
significant improvement in that shoulder (Tr. 313). She also
reported that she experienced significant relief from a continu-
ous passive movement machine and cold therapy (Tr. 313). On
November 7, plaintiff reported that she had been doing well until

---

[45]Osteoarthritis is "a noninflammatory degenerative joint
disease seen mainly in older persons, characterized by degenera-
tion of the articular cartilage, hypertrophy of bone at the
margins, and changes in the synovial membrane." Dorland's at
1344.  The condition is "accompanied by pain, usually after
prolonged activity, and stiffness, particularly in the morning or
with inactivity." Dorland's at 1344.

[46]The retinaculum is a "structure that retains an organ or
tissue in place." Dorland's at 1632.

she developed significant right shoulder pain while stretching out her right arm on the day of the appointment (Tr. 312). Plaintiff's shoulder was tender to palpation and had "2+" edema[47] (Tr. 312). Dr. Wright assessed internal derangement and bursitis in the right shoulder and recommended that plaintiff continue to attend physical therapy (Tr. 312).

### d. 2014

#### i. Dr. Wright

On January 2, 2014, plaintiff complained to Dr. Wright of swelling in her right shoulder, which was accompanied by pain that was exacerbated by activity (Tr. 310). Sensation was intact, and plaintiff was able to elevate forward to 150 degrees, rotate externally to 60 degrees and rotate internally to L1 with her shoulder (Tr. 310). Plaintiff was diagnosed with an internal derangement, bursitis and a ganglion cyst (Tr. 310). After the cyst was removed, plaintiff reported a significant improvement in the shoulder (Tr. 310).

On February 28, plaintiff reported that her left knee locked intermittently, with pain at a nine on a scale of ten (Tr.

---

[47]Edema is "the presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body, usually referring to subcutaneous tissues." Dorland's at 593.

401). The knee's range of motion was 0 to 125 degrees, and it was stable (Tr. 401). McMurray's and Lachman's tests were both negative (Tr. 401). An x-ray revealed mild to moderate arthritic changes (Tr. 401). Plaintiff also reported that her shoulder continued to improve with physical therapy (Tr. 401). Plaintiff was able to elevate forward to 150 degrees, rotate externally to 60 degrees and rotate internally to L1 with her right shoulder (Tr. 401). The shoulder was also non-tender to palpation (Tr. 401). Dr. Wright assessed internal derangement of the left knee and right shoulder (Tr. 402).

### ii. Peak Physical Therapy South, PLLC

Plaintiff attended physical therapy at Peak Physical Therapy South, PLLC. In January 2014, a therapist noted that plaintiff's right shoulder was improving in strength and range of motion, though plaintiff continued to experience pain (Tr. 330). In February, the therapist noted that the active range of motion in plaintiff's right shoulder was within normal limits and that there was tenderness and swelling in plaintiff's left knee (Tr. 478, 482, 485-86, 491). The therapist also noted that there was less pain in the right shoulder, with strength of four plus on a scale of five (Tr. 480, 483, 491).

In March, plaintiff started additional knee exercises to address her knee pain and locking (Tr. 494). Plaintiff had strength in her left knee of five out of five (Tr. 497, 500, 509, 512). The therapist noted that plaintiff's knee pain limited her ability to walk and that she could not kneel (Tr. 501, 509). The therapist also noted tenderness and swelling in the knee (Tr. 509, 512). Additionally, during this time, plaintiff's strength in her right shoulder improved to a five out of five (Tr. 506).

In April, the therapist reported increased edema and swelling in plaintiff's left knee, along with tenderness (Tr. 515-16, 525-26). The therapist also added new exercises for plaintiff's right shoulder to address pain that limited her strength (Tr. 521).

### iii.  Dr. Harvey Seigel

Dr. Harvey Seigel examined plaintiff on April 3, 2014 in connection with an insurance claim for her 2013 car accident (Tr. 447). Dr. Seigel noted that plaintiff walked with a normal gait (Tr. 453). An examination of plaintiff's cervical spine revealed a full range of motion on flexion, 45 out of 60 degrees on extension, 60 out of 80 degrees on rotation and 30 out of 45 degrees on lateral side bending (Tr. 453-54).

Dr. Siegel examined plaintiff's shoulders. On forward flexion, the range of motion of plaintiff's right shoulder was 150 out of 180 degrees, while it was 165 out of 180 degrees for the left shoulder (Tr. 454). Plaintiff had a full range of motion on extension and adduction for both shoulders (Tr. 454). She had a range of motion of 135 out of 180 degrees on abduction for both shoulders (Tr. 454). Plaintiff complained of pain in her right shoulder with abduction (Tr. 455). On external rotation, plaintiff's range of motion was 75 out of 90 degrees for the right shoulder and a normal range of motion for the left shoulder (Tr. 455). On internal rotation, plaintiff's range of motion was L2 out of T8 to T10 for the right shoulder and T12 out of T8 to T10 for the left shoulder (Tr. 454). There was no swelling or deformity in the shoulders, although the lateral aspect of both shoulders was tender on palpation (Tr. 455). Impingement signs were positive for the right shoulder and negative for the left shoulder (Tr. 455).

Plaintiff had a full range of motion in both wrists except for flexion of the right wrist, which was 50 out of 60 degrees (Tr. 455). The right wrist was tender, and plaintiff complained of pain in that wrist (Tr. 455).

An examination of plaintiff's knees revealed a normal range of motion on flexion of the right knee and 130 out of 135

29

to 150 degrees in the left knee and a normal range of motion on extension in both knees (Tr. 456). There was no swelling, deformity, effusion or instability (Tr. 456). Plaintiff complained of pain in the left knee (Tr. 456).

Dr. Seigel also found that there was no evidence of muscle weakness in either plaintiff's legs or arms and that plaintiff had a strong grip (Tr. 456-57). Plaintiff had a rapid and well-coordinated sequential pinching and a strong two- and three-finger pinch (Tr. 456-57). Plaintiff complained of diminished sensation in the fourth and fifth fingers of her right hand (Tr. 456).

Dr. Seigel diagnosed plaintiff with a cervical strain/sprain, superimposed on a pre-existing and still symptomatic degenerative disc disease and prior surgical fusion, "resolved to status quo ante"[48]; a contusion/sprain of the left wrist, resolved and a contusion of the left knee, superimposed on a still symptomatic pre-existing degenerative joint disease and prior arthroscopy (Tr. 457). He noted that there was no need for further physical therapy, household help, special transportation, durable medical equipment or diagnostic testing (Tr. 457-58). Dr. Seigel opined that plaintiff was capable of performing all

_____

[48]The record does not disclose what Dr. Siegel meant by the "status quo ante."

30

the activities of daily living and that some of plaintiff's prior treatment and diagnostic testing were overly aggressive (Tr. 457-58).

### iv.  Dr. Robert Hendler

On April 12, 2014, Dr. Robert Hendler also examined plaintiff in connection with the 2013 car accident (Tr. 459). Dr. Hendler noted a normal examination of plaintiff's cervical spine, shoulders, wrists and knees (Tr. 462-64). He opined that plaintiff may have sustained a cervical sprain with a temporary exacerbation of a prior pre-existing cervical spine problem (Tr. 463). He did not believe plaintiff had a physical disability with respect to her cervical spine, shoulders or left knee (Tr. 464).

### D.  Proceeding
### Before the ALJ

An attorney represented plaintiff at the April 17, 2014 hearing before ALJ Gonzalez at which plaintiff testified (Tr. 34). She explained that she had pain in her left knee, shoulders and neck, although the pain was not constant (Tr. 46-47, 63-65). She also explained that her left knee locked (Tr. 57). Additionally, plaintiff testified that the worst pain was in her neck and

that she experienced a tingling sensation down her right arm and
into her pinky and ring fingers (Tr. 46-48, 55-56). She testi-
fied that when she looked down, such as when reading a book, her
neck pain would start and radiate downward (Tr. 55).

Plaintiff took Advil for her pain, sometimes up to 20
pills a day, and she also took hydrocodone approximately four
times a month if her neck pain was serious (Tr. 45, 47-48).
Injections only provided temporary relief, with the pain return-
ing a few days later (Tr. 46). She also used a transcutaneous
electrical nerve stimulators ("TENS") unit[49] and a knee rocker[50]
(Tr. 59). Additionally, plaintiff's physical therapist pre-
scribed exercises for plaintiff to perform at home (Tr. 60).
Although plaintiff had formerly exercised at a gym, she stopped
because of pain (Tr. 60-61). Plaintiff testified that she never
saw a pain management specialist because Dr. Wright never men-
tioned one (Tr. 65).

Plaintiff also testified that she had difficulty
reaching over her head, mostly because of her right arm (Tr. 47).

---

[49]A TENS unit uses electric currents produced by the device
to stimulate the nerves for therapeutic purposes. Colon-Sanchez
v. Commissioner of Soc. Sec., No. 5:14-CV-0705 (TJM/DEP), 2016 WL
638816 at *2 n.5 (N.D.N.Y. Jan. 25, 2016) (Report & Recommenda-
tion), adopted by, 2016 WL 632548 (N.D.N.Y. Feb. 17, 2016).

[50]Plaintiff described the knee rocker as a small apparatus
in which she places her foot and rocks (Tr. 59).

32

She had great difficulty reaching outwards because of pain (Tr. 56). As a result of these limitations, plaintiff testified that she needed to hold pots with both hands and exercise caution because her right hand gave way (Tr. 56-57, 70-71). She also could not lift more than five pounds (Tr. 62). Plaintiff also testified that she had difficulty turning her head because of neck pain (Tr. 55).

Plaintiff stated that she could sit for twenty or thirty minutes at a time before she had to get up and stretch for a few minutes (Tr. 62). She could not stand for more than fifteen or twenty minutes at a time because her knee would lock (Tr. 62).

The ALJ also heard testimony from Helene Feldman, a vocational expert (Tr. 66).[51] She testified that plaintiff was previously a "police officer I," which is medium-strength level

---

[51]During questioning of the vocational expert by plaintiff's attorney, the ALJ frequently interrupted to ask questions of his own or to clarify questions posed by the attorney. As a result, at times it is difficult to understand the expert's testimony.

with a specific vocational preparation time ("SVP") of six[52] (Tr. 67).

The ALJ asked the expert to assume that an individual of plaintiff's age, education and work history had the residual functional capacity ("RFC") to perform "a limited range of light work" with the following limitations: the individual could frequently flex, extend, rotate the neck and handle objects with the right arm; occasionally reach overhead bilaterally, crouch, stoop, kneel, climb stairs and push and pull but should avoid crawling (Tr. 68, 71). The ALJ asked whether the individual would be able to perform plaintiff's past work, and the expert testified that such an individual would not (Tr. 68). The expert further testified that such an individual could be a dental floss

---

[52]SVP refers to the amount of time it takes for an individual to learn a given job. Bradley v. Commissioner of Soc. Sec., 12 Civ. 7300 (ER), 2015 WL 1069307 at *5 n.7 (S.D.N.Y. Mar. 11, 2015) (Ramos, D.J.) (adopting report and recommendation), citing Urena-Perez v. Astrue, 06 Civ. 2589 (JGK)(MHD), 2009 WL 1726217 at *20 n.43 (S.D.N.Y. Jan. 6, 2009) (Dolinger, M.J.) (Report & Recommendation), adopted by and modified on other grounds, 2009 WL 176212 (S.D.N.Y. June 18, 2009) (Koeltl, D.J.). It utilizes a scale from one to nine; the higher the number, the greater the skill required to do the job. Bradley v. Commissioner of Soc. Sec., supra, 2015 WL 1069307 at *5 n.7, citing Urena-Perez v. Astrue, supra, 2009 WL 1726217 at *20 n.43. An SVP of six means that it takes between one and two years to learn the job. Mendieta v. Colvin, No. C15-1937-JCC, 2017 WL 942901 at *7 n.9 (W.D. Wa. Mar. 9, 2017), citing Dictionary of Occupational Titles, Appendix C at 1009 (4th ed. 1991); Nottage v. Colvin, No. 12-22135-CIV-OTAZO-REYES, 2013 WL 12107875 at *5 n.17 (S.D. Fla. Oct. 24, 2013).

packer, office helper, file clerk and collator operator (Tr. 69). If there were an additional limitation that the individual could only occasionally reach out in front of her, the expert's answer would change, although she did not state how (Tr. 78-79). If the individual could keep her neck down for no more than fifteen minutes at a time, the expert testified that her answer might change, but it would depend on the specific task and whether the employer provided any accommodations (Tr. 82-83). Alternatively, if the individual could only occasionally handle objects with her right arm, the expert testified that it might limit the availability of the jobs she previously identified because those jobs required frequent handling (Tr. 88-90).

The ALJ next asked the expert to assume that an individual of plaintiff's age, education and work history had the RFC to perform a "limited range of sedentary work" with the same limitations identified in the previous hypothetical, i.e., the individual could frequently flex, extend, rotate the neck and handle objects with the right arm; occasionally reach overhead bilaterally, crouch, stoop, kneel, climb stairs and push and pull but should avoid crawling (Tr. 69-70, 72). The expert testified that such an individual would not be able to perform plaintiff's past work, although the individual could be a telephone quotation clerk, document preparer, charge account clerk and ticket checker

35

(Tr. 73). If a sit/stand option were an additional limitation to this hypothetical, the expert testified that the individual would not be able to perform plaintiff's past work, although she would still be able to be a telephone quotation clerk, document preparer, charge account clerk and ticket checker (Tr. 73-74). However, the expert also testified that, because the sit/stand option is an accommodation provided by the employer, that limitation might reduce the number of jobs available for a telephone quotation clerk (Tr. 74-76). Alternatively, if the individual could only occasionally reach out in front of her, it might impact her ability to perform the requirements of a document preparer and charge account clerk (Tr. 93-96). As another alternative limitation, if the individual could only occasionally handle objects with the right hand, the expert testified that the individual would not be able to perform the requirements of a telephone quotation clerk, document preparer, charge account clerk or ticket checker (Tr. 99).

III. Analysis

    A. Applicable
       Legal Principles

       1. Standard of Review

The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard. 42 U.S.C. § 405(g); Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam); Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008). Moreover, the court cannot "'affirm an administrative action on grounds different from those considered by the agency.'" Lesterhuis v. Colvin, 805 F.3d 83, 87 (2d Cir. 2015) (per curiam), quoting Burgess v. Astrue, supra, 537 F.3d at 128.

The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence. Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003), citing Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." Ellington v. Astrue, 641 F. Supp. 2d 322,

328 (S.D.N.Y. 2009) (Marrero, D.J.). However, "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

"'Substantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Talavera v. Astrue, supra, 697 F.3d at 151, quoting Richardson v. Perales, 402 U.S. 389, 401 (1971). Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam), quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982). Thus, "[i]n determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Selian v. Astrue, supra, 708 F.3d at 417 (internal quotation marks omitted).

## 2. Determination
## of Disability

Under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., a claimant is entitled to DIB if she can establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both impairment and inability to work must last twelve months).[53] The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. § 423(d)(3), and it must be

> of such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [the claimant] lives, or whether a specific job vacancy exists for [the claimant], or whether [the claimant] would be hired if [the claimant] applied for work.

42 U.S.C. § 423(d)(2)(A). In addition, to obtain DIB, the

___

[53]The standards that must be met to receive DIB are the same as the standards that must be met to receive Supplemental Security Income benefits under Title XVI of the Act. Barnhart v. Thomas, 540 U.S. 20, 24 (2003). Accordingly, cases addressing the latter are equally applicable to cases involving the former.

39

claimant must have become disabled between the alleged onset date
and the date on which she was last insured. See 42 U.S.C. §§
416(i), 423(a); McKinstry v. Astrue, 511 F. App'x 110, 111 (2d
Cir. 2013) (summary order), citing Kohler v. Astrue, 546 F.3d
260, 265 (2d Cir. 2008); 20 C.F.R. §§ 404.130, 404.315.

In making the disability determination, the Commis-
sioner must consider: "'(1) the objective medical facts; (2)
diagnoses or medical opinions based on such facts; (3) subjective
evidence of pain or disability testified to by the claimant or
others; and (4) the claimant's educational background, age, and
work experience.'" Brown v. Apfel, 174 F.3d 59, 62 (2d Cir.
1999) (per curiam), quoting Mongeur v. Heckler, 722 F.2d 1033,
1037 (2d Cir. 1983) (per curiam).

In determining whether an individual is disabled, the
Commissioner must follow the five-step process required by the
regulations.  20 C.F.R. § 404.1520(a)(4)(i)-(v); see Selian v.
Astrue, supra, 708 F.3d at 417-18; Talavera v. Astrue, supra, 697
F.3d at 151.  The first step is a determination of whether the
claimant is engaged in substantial gainful activity.  20 C.F.R. §
404.1520(a)(4)(i).  If she is not, the second step requires
determining whether the claimant has a "severe medically determi-
nable physical or mental impairment."  20 C.F.R.
§ 404.1520(a)(4)(ii).  If the claimant does not have a severe

40

medically determinable impairment or combination of impairments, she is not disabled. See Henningsen v. Commissioner of Soc. Sec. Admin., 111 F. Supp. 3d 250, 264 (E.D.N.Y. 2015); 20 C.F.R. § 404.1520(c). If she does, the inquiry at the third step is whether any of these impairments meet one of the listings in Appendix 1 of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If the answer to this inquiry is affirmative, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not meet any of the listings in Appendix 1, step four requires an assessment of the claimant's RFC and whether the claimant can still perform her past relevant work given her RFC. 20 C.F.R. § 404.1520(a)(4)(iv); see Barnhart v. Thomas, supra, 540 U.S. at 24-25. If she cannot, then the fifth step requires assessment of whether, given the claimant's RFC, she can make an adjustment to other work. 20 C.F.R. § 404.1520(a)(4)(v). If she cannot, she will be found disabled. 20 C.F.R. § 404.1520(a)(4)(v).

RFC is defined in the applicable regulations as "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). To determine RFC, the ALJ "'identif[ies] the individual's functional limitations or re-strictions and assess[es] his or her work-related abilities on a function-by-function basis, including the functions in paragraphs

41

(b),(c), and (d) of 20 [C.F.R. §§] 404.1545 and 416.945.'"

Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per

curiam), quoting Social Security Ruling ("SSR") 96-8p, 1996 WL

374184 at *1 (July 2, 1996). The results of this assessment

determine the claimant's ability to perform the exertional

demands of sustained work which may be categorized as sedentary,

light, medium, heavy or very heavy.[54]  20 C.F.R. § 404.1567; see

Schaal v. Apfel, 134 F.3d 496, 501 n.6 (2d Cir. 1998). This

ability may then be found to be limited further by nonexertional

factors that restrict the claimant's ability to work.[55]  See

Michaels v. Colvin, 621 F. App'x 35, 38 n.4 (2d Cir. 2015)

(summary order); Zabala v. Astrue, 595 F.3d 402, 410-11 (2d Cir.

2010).

The claimant bears the initial burden of proving

disability with respect to the first four steps. Once the

claimant has satisfied this burden, the burden shifts to the

---

[54]Exertional limitations are those which "affect only [the
claimant's] ability to meet the strength demands of jobs (sit-
ting, standing, walking, lifting, carrying, pushing, and pull-
ing)." 20 C.F.R. § 404.1569a(b).

[55]Nonexertional limitations are those which "affect only
[the claimant's] ability to meet the demands of jobs other than
the strength demands," including difficulty functioning because
of nervousness, anxiety or depression, maintaining attention or
concentration, understanding or remembering detailed instruc-
tions, seeing or hearing, tolerating dust or fumes, or manipula-
tive or postural functions, such as reaching, handling, stooping,
climbing, crawling or crouching. 20 C.F.R. § 404.1569a(c).

Commissioner to prove the final step -- that the claimant's RFC allows the claimant to perform some work other than her past work. Selian v. Astrue, supra, 708 F.3d at 418; Burgess v. Astrue, supra, 537 F.3d at 128; Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended in part on other grounds on reh'g, 416 F.3d 101 (2d Cir. 2005).

In some cases, the Commissioner can rely exclusively on the medical-vocational guidelines (the "Grids") contained in C.F.R. Part 404, Subpart P, Appendix 2 when making the determination at the fifth step. Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995). "The Grid[s] take[] into account the claimant's RFC in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid[s] indicate[] whether the claimant can engage in any other substantial gainful work which exists in the national economy." Gray v. Chater, supra, 903 F. Supp. at 298; see Butts v. Barnhart, supra, 388 F.3d at 383.

Exclusive reliance on the Grids is not appropriate where nonexertional limitations "significantly diminish [a claimant's] ability to work." Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986); accord Butts v. Barnhart, supra, 388 F.3d at 383. "Significantly diminish" means "the additional loss of work capacity beyond a negligible one or, in other words, one that so

43

narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." Bapp v. Bowen, supra, 802 F.2d at 606 (footnote omitted); accord Selian v. Astrue, supra, 708 F.3d at 421; Zabala v. Astrue, supra, 595 F.3d at 411. When the ALJ finds that the nonexertional limitations significantly diminish a claimant's ability to work, then the Commissioner must introduce the testimony of a vocational expert or other similar evidence in order to prove "that jobs exist in the economy which [the] claimant can obtain and perform." Butts v. Barnhart, supra, 388 F.3d at 383-84 (internal quotation marks omitted); see Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an individual's capabilities are not described accurately by a rule, the regulations make clear that the individual's particular limitations must be considered."). An ALJ may rely on a vocational expert's testimony in response to a hypothetical if there is "substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion." Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983) (footnote omitted); accord Snyder v. Colvin, 667 F. App'x 319, 321 (2d Cir. 2016) (summary order) ("When the hypothetical posed to the vocational expert is based on a residual functional capacity finding that is supported by substantial evidence, the hypothetical is proper and the ALJ is entitled to rely on the vocational expert's testi-

44

mony."); Rivera v. Colvin, 11 Civ. 7469 (LTS)(DF), 2014 WL
3732317 at *40 (S.D.N.Y. July 28, 2014) (Swain, D.J.) ("Provided
that the characteristics described in the hypothetical question
accurately reflect the limitations and capabilities of the
claimant and are based on substantial evidence in the record, the
ALJ may then rely on the vocational expert's testimony regarding
jobs that could be performed by a person with those characteris-
tics.").

### 3. Full and Fair Hearing and
### Duty to Develop the Record

Before a district court evaluates an ALJ's analysis, a
threshold question is whether "the claimant has had a full
hearing under the . . . regulations and in accordance with the
beneficent purposes of the [Social Security] Act." Moran v.
Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (alterations in origi-
nal; internal quotation marks omitted).

A claimant can be deprived of a full and fair hearing
as a result of an ALJ's bias. See Whitfield v. Astrue, 476 F.
App'x 408, 409 (2d Cir. 2012) (summary order). "[A]lthough due
process demands impartiality by administrative adjudicators,
court 'must start . . . from the presumption that [these adjudi-
cators] are unbiased.'" Harris v. Colvin, No. 2:14-cv-65-jmc,

45

2015 WL 282014 at *4 (D. Vt. Jan. 22, 2015) (second and third alterations in original), quoting Schweiker v. McClure, 456 U.S. 188, 195 (1982); see Bodine v. Colvin, No. 3:11-CV-1265 (LEK/DEP-), 2013 WL 1108625 at *7 (N.D.N.Y. Feb. 25, 2013) (Report & Recommendation), adopted by, 2013 WL 1104127 (N.D.N.Y. Mar. 18, 2013). "'This presumption can be rebutted by a showing of conflict of interest or some other specific reason for disquali-fication[; b]ut the burden of establishing a disqualifying interest rests on the party making the assertion.'" Harris v. Colvin, supra, 2015 WL 282014 at *4 (alteration in original), quoting Schweiker v. McClure, supra, 456 U.S. at 195-96. In order to show that an ALJ's bias resulted in the denial of a fair hearing, the claimant must show that the ALJ exhibited a "deep-seated favoritism or antagonism that would make fair judgment impossible." Liteky v. United States, 510 U.S. 540, 555 (1994); accord Whitfield v. Astrue, supra, 476 F. App'x at 409.

In determining whether the claimant received a full and fair hearing, the reviewing court must also determine whether the ALJ fully developed the record. Moran v. Astrue, supra, 569 F.3d at 112-15; Corporan v. Commissioner of Soc. Sec., 12 Civ. 6704 (JPO), 2015 WL 321832 at *22 (S.D.N.Y. Jan. 23, 2015) (Oetken, D.J.) (adopting report and recommendation). "It is the rule in [the Second] [C]ircuit that 'the ALJ, unlike a judge in a trial,

46

must [him]self affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.'" Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996), quoting Echevarria v. Secretary of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982); see 20 C.F.R. § 404.1512(d) (2015).[56]

> This duty exists even when the claimant is represented by counsel or . . . by a paralegal . . . . The [Commissioner's] regulations describe this duty by stating that, "[b]efore we make a determination that you are not disabled, we will develop your complete medical history . . . [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports." 20 C.F.R. § 404.1512(d).

Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996) (second and third brackets and third ellipses in original); accord Petrie v. Astrue, 412 F. App'x 401, 406 (2d Cir. 2011) (summary order) ("[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel." (alteration in original; internal quotation marks omitted)); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) ("We have stated many times that the ALJ generally has an affirmative obligation to develop the administrative record . . . ." (internal quotation

_____

[56]On March 27, 2017, the ALJ's duty to develop the record was recodified from Section 404.1512(d) to Section 404.1512(b) without any substantive changes.

marks omitted)); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) ("The ALJ has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsel."); Tejada v. Apfel, supra, 167 F.3d at 774 (same); Van Dien v. Barnhart, 04 Civ. 7259 (PKC), 2006 WL 785281 at *14 (S.D.N.Y. Mar. 24, 2006) (Castel, D.J.) (same).

The ALJ is required "affirmatively to seek out additional evidence only where there are 'obvious gaps' in the administrative record." Eusepi v. Colvin, 595 F. App'x 7, 9 (2d Cir. 2014) (summary order), quoting Rosa v. Callahan, 168 F.3d 72, 79 & n.5 (2d Cir. 1999); accord Swiantek v. Commissioner of Soc. Sec., 588 F. App'x 82, 84 (2d Cir. 2015) (summary order).[57] "[T]he current amended regulations . . . give an ALJ more discretion to 'determine the best way to resolve the inconsistency or

---

[57]On March 26, 2012, the regulations were modified to delete language that required an ALJ to recontact a treating physician when "the report from [a claimant's] medical source contain[ed] a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.1512(e)(1) (2010); see How We Collect & Consider Evidence of Disability, 77 Fed. Reg. 10,651, 10,651 (Feb. 23, 2012) (codified at 20 C.F.R. pts. 404, 416). The amended regulations apply here. See Lowry v. Astrue, 474 F. App'x 801, 804 n.2 (2d Cir. 2012) (summary order) (applying the version of the regulations that were current at the time the ALJ adjudicated the plaintiff's claim).

insufficiency' based on the facts of the case . . . ." <u>Rolon v.</u>

<u>Commissioner of Soc. Sec.</u>, 994 F. Supp. 2d 496, 505 (S.D.N.Y.

2014) (Nathan, D.J.), <u>quoting</u> 20 C.F.R. §§ 404.1520b(c)(1),

416.920b(c)(1) (2013). However, the regulations continue to

"contemplate the ALJ recontacting treating physicians when 'the

additional information needed is directly related to that source-

's medical opinion.'" <u>Jimenez v. Astrue</u>, 12 Civ. 3477 (GWG),

2013 WL 4400533 at *11 (S.D.N.Y. Aug. 14, 2013) (Gorenstein,

M.J.), <u>quoting</u> <u>How We Collect and Consider Evidence of Disabil-</u>

<u>ity</u>, <u>supra</u>, 77 Fed. Reg. at 10,652.

> "[I]f a physician's finding in a report is believed to
> be insufficiently explained, lacking in support, or
> inconsistent with the physician's other reports, the
> ALJ must seek clarification and additional information
> from the physician." <u>Calzada v. Asture</u>, 753 F. Supp.
> 2d 250, 269 (S.D.N.Y. 2010); <u>see</u> <u>also</u> <u>Rosa</u>, 168 F.3d at
> 79 (citing <u>Perez v. Chater</u>, 77 F.3d 41, 47 (2d Cir.
> 1996)). The rationale behind this rule is that "a
> treating physician's 'failure to include this type of
> support for the findings in his report does not mean
> that such support does not exist; he might not have
> provided this information in the report because he did
> not know that the ALJ would consider it critical to the
> disposition of the case.'" <u>Rosa</u>, 168 F.3d at 80 (quot-
> ing <u>Clark v. Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118 (2d
> Cir. 1998)).

<u>Geronimo v. Colvin</u>, 13 Civ. 8263 (ALC), 2015 WL 736150 at *5

(S.D.N.Y. Feb. 20, 2015) (A. Carter, D.J.).

"Remand is appropriate if the reviewing court concludes

that the claimant did not receive a full and fair hearing."

Corporan v. Commissioner of Soc. Sec., supra, 2015 WL 321832 at
*2, citing Selmo v. Barnhart, 01 Civ. 7374 (SHS), 2002 WL 314450-
20 at *7 (S.D.N.Y. Oct. 31, 2002) (Stein, D.J.). "Failure to
sufficiently develop the administrative record results in the
denial to [the] claimant of a full and fair hearing and is thus
grounds for remand." Price ex rel. A.N. v. Astrue, 42 F. Supp.
3d 423, 432 (E.D.N.Y. 2014); see Lopez v. Secretary of Dep't of
Health & Human Servs., 728 F.2d 148, 150 (2d Cir. 1984).

### 4. Treating Physician Rule

In considering the evidence in the record, the ALJ must
give deference to the opinions of a claimant's treating physi-
cians. A treating physician's opinion will be given controlling
weight if it is "well-supported by medically acceptable clinical
and laboratory diagnostic techniques and is not inconsistent with
the other substantial evidence in [the] case record." 20 C.F.R.
§ 404.1527(c)(2)[58]; see also Shaw v. Chater, supra, 221 F.3d at
134; Diaz v. Shalala, 59 F.3d 307, 313 n.6 (2d Cir. 1995);
Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).

---

[58]The SSA recently adopted regulations that change the
standards applicable to the review of medical opinion evidence
for claims filed on or after March 27, 2017. See 20 C.F.R. §
404.1520c. Because plaintiff's claim was filed before that date,
these amended regulations do not apply here.

"[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight. 20 C.F.R. § 404.1527(c)(2); see Schisler v. Sullivan, supra, 3 F.3d at 568; Burris v. Chater, 94 Civ. 8049 (SHS), 1996 WL 148345 at *4 n.3 (S.D.N.Y. Apr. 2, 1996) (Stein, D.J.). The Second Circuit has noted that it "'do[es] not hesitate to remand when the Commissioner has not provided "good reasons" for the weight given to a treating physician[']s opinion.'" Morgan v. Colvin, 592 F. App'x 49, 50 (2d Cir. 2015) (summary order) (second alteration in original), quoting Halloran v. Barnhart, supra, 362 F.3d at 33; accord Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015) (per curiam). Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ must consider various factors to determine the amount of weight the opinion should be given. These factors include: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area and (6) other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)-(6); see Schisler v. Sullivan, supra, 3 F.3d at 567; Mitchell v. Astrue, 07 Civ. 285 (JSR), 2009 WL 3096717 at *16 (S.D.N.Y. Sept.

51

28, 2009) (Rakoff, D.J.); Matovic v. Chater, 94 Civ. 2296 (LMM), 1996 WL 11791 at *4 (S.D.N.Y. Jan. 12, 1996) (McKenna, D.J.). Although the foregoing factors guide an ALJ's assessment of a treating physician's opinion, the ALJ need not expressly address each factor. Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear.").

As long as the ALJ provides "good reasons" for the weight accorded to the treating physician's opinion and the ALJ's reasoning is supported by substantial evidence, remand is unwar- ranted. See Halloran v. Barnhart, supra, 362 F.3d at 32-33; see also Atwater v. Astrue, supra, 512 F. App'x at 70; Petrie v. Astrue, supra, 412 F. App'x at 406-08; Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir. 2009) (summary order). "While the opinions of a treating physician deserve special respect, they need not be given controlling weight where they are contradicted by other substantial evidence in the record." Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted). The ALJ is responsible for determining whether a claimant is "disabled" under the Act and need not credit a physician's determination to this effect where it is contradicted by the medical record. See Wells v. Commissioner of Soc. Sec., 338 F. App'x 64, 66 (2d Cir.

2009) (summary order). The ALJ may rely on a consultative

opinion where it is supported by substantial evidence in the

record. See Richardson v. Perales, supra, 402 U.S. at 410;

Camille v. Colvin, 652 F. App'x 25, 27-28 (2d Cir. 2016) (summary

order); Diaz v. Shalala, supra, 59 F.3d at 313 n.5; Mongeur v.

Heckler, supra, 722 F.2d at 1039.


## 5. Credibility


In determining a claimant's RFC, the ALJ is required to

consider the claimant's reports of pain and other limitations, 20

C.F.R. § 404.1529, but is not required to accept the claimant's

subjective complaints without question. McLaughlin v. Secretary

of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir. 1980).

"It is the function of the [Commissioner], not [the reviewing

courts], to resolve evidentiary conflicts and to appraise the

credibility of witnesses, including the claimant." Carroll v.

Secretary of Health & Human Servs., 705 F.2d 638, 642 (2d Cir.

1983), citing Richardson v. Perales, supra, 402 U.S. at 399; see

Mimms v. Heckler, 750 F.2d 180, 185-86 (2d Cir. 1984); Aponte v.

Secretary, Dep't of Health & Human Servs., 728 F.2d 588, 591-92

(2d Cir. 1984). The ALJ has discretion to weigh the credibility

of the claimant's testimony in light of the medical findings and

53

other evidence in the record. <u>Marcus v. Califano</u>, 615 F.2d 23,

27 (2d Cir. 1979).

The regulations provide a two-step process for evaluat-

ing a claimant's subjective complaints.

> At the first step, the ALJ must decide whether the
> claimant suffers from a medically determinable impair-
> ment that could reasonably be expected to produce the
> symptoms alleged. 20 C.F.R. § 404.1529(b). That
> requirement stems from the fact that subjective asser-
> tions of pain <u>alone</u> cannot ground a finding of disabil-
> ity. 20 C.F.R. § 404.1529(a). If the claimant does
> suffer from such an impairment, at the second step, the
> ALJ must consider "the extent to which [the claimant's]
> symptoms can reasonably be accepted as consistent with
> the objective medical evidence and other evidence" of
> record. <u>Id</u>. The ALJ must consider "[s]tatements [the
> claimant] or others make about [her] impairment(s),
> [her] restrictions, [her] daily activities, [her]
> efforts to work, or any other relevant statements [she]
> make[s] to medical sources during the course of exami-
> nation or treatment, or to [the agency] during inter-
> views, on applications, in letters, and in testimony in
> [its] administrative proceedings." 20 C.F.R. §
> 404.1512(b)(3); <u>see</u> <u>also</u> 20 C.F.R. § 404.1529(a);
> S.S.R. 96-7p.

<u>Genier v. Astrue</u>, <u>supra</u>, 606 F.3d at 49 (emphasis in original);

<u>see</u> <u>Snyder v. Colvin</u>, <u>supra</u>, 667 F. App'x at 320, <u>citing</u> SSR 16-

3P, 2016 WL 1020935 (Mar. 16, 2016)[59]; 20 C.F.R. § 416.1529(a).

The ALJ must explain the decision to reject a claimant's testi-

mony "'with sufficient specificity to enable the [reviewing]

---

[59]SSR 16-3p supersedes SSR 96-7p, 1996 WL 374186 (July 2,
1996), and clarifies the policies set forth in the previous SSR.
<u>See</u> SSR 16-3P, <u>supra</u>, 2016 WL 1237954.

Court to decide whether there are legitimate reasons for the ALJ's disbelief' and whether [the ALJ's] decision is supported by substantial evidence." Calzada v. Astrue, 753 F. Supp. 2d 250, 280 (S.D.N.Y. 2010) (Sullivan, D.J.) (first alteration in original) (adopting report and recommendation), quoting Fox v. Astrue, No. 05 Civ. 1599 (NAM)(DRH), 2008 WL 828078 at *12 (N.D.N.Y. Mar. 26, 2008); see Lugo v. Apfel, 20 F. Supp. 2d 662, 664 (S.D.N.Y. 1998) (Rakoff, D.J.). The ALJ's determination of credibility is entitled to deference. See Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999) ("After all, the ALJ is in a better position to decide issues of credibility."); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995) (Leisure, D.J.) ("Deference should be accorded the ALJ's determination because he heard plaintiff's testimony and observed his demeanor.").

B.    The ALJ's Decision

        The ALJ applied the five-step analysis described above and determined that plaintiff was not disabled (Tr. 13-27).

        At step one of the sequential analysis, the ALJ determined that plaintiff had not engaged in substantial gainful activity since January 19, 2011, the date plaintiff alleges her disability began (Tr. 15, citing 20 C.F.R. §§ 404.1571 et seq.).

At step two, the ALJ found that plaintiff had the following severe medically determinable impairments:  lumbar spine disc herniations, degenerative disc disease, stenosis, a cervical spine disc herniation and radiculopathy, status post spinal fusion, bilateral shoulder arthroscopies, status post right wrist arthroscopy, obesity, right ulnar neuropathy, right shoulder bursitis, DeQuervain's disease[60] of the right wrists, status post arthroscopy, right knee arthritis, left knee internal derangement and meniscus tear, diabetes mellitus and right shoulder ganglion cyst (Tr. 15).

At step three, the ALJ found that plaintiff's impairments did not meet or equal the criteria of the listed impairments and that plaintiff was not, therefore, entitled to a presumption of disability (Tr. 15-16).  Specifically, the ALJ analyzed whether plaintiff's impairments met listing 1.02 (major dysfunction of a joint), 1.03 (reconstructive surgery or surgical arthrodesis of a major weight-bearing joint) and 1.04 (disorders of the spine).  20 C.F.R. Pt. 404, Subpt. P, App. 1.

---

[60]DeQuervain's disease is an "overuse injury with painful tenosynovitis due to relative narrowness of the common tendon sheath of the abductor pollicis longus and extensor pollicis brevis."  Dorland's at 532.

The ALJ then determined that plaintiff had the RFC to perform light work,[61] except plaintiff "can occasionally reach overhead bilaterally; occasionally crouch, stoop, kneel, and climb stairs; cannot crawl; can frequently flex, extend, and rotate the neck; frequently handle with right upper extremity; and can occasionally push and pull" (Tr. 16).

To reach his RFC determination, the ALJ examined the opinions of the treating, consulting and independent physicians and assessed the weight to give to each opinion based on the objective medical record.

The ALJ afforded great weight to Dr. Hendler's opinion because he was an expert in orthopedics, and he examined plaintiff and reviewed her medical records (Tr. 25). According to the ALJ, Dr. Hendler detailed his clinical findings and noted that plaintiff could engage in her activities of daily living (Tr. 25). Although Dr. Hendler did not provide a function-by-function assessment of basic work activities, Dr. Hendler noted that plaintiff did not have an orthopedic disability. The ALJ con-

---

[61]Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

cluded that "[o]verall, his thorough exam, his expertise and objective clinical findings also provide substantial evidence to support the [ALJ's RFC assessment]" (Tr. 25).

The ALJ also afforded great weight to Dr. Seigel's opinion "for similar reasons" (Tr. 25). The ALJ noted that although Dr. Seigel did not provide a function-by-function assessment of plaintiff's basic work activities, "his thorough physical examination and detailed clinical findings provides substantial evidence to support [the conclusion that plaintiff could do light work]" (Tr. 25).

The ALJ noted that Dr. Brisson's opinion that plaintiff was disabled from her previous occupation "is given great weight because he is a treating source and it is consistent with the evidence" (Tr. 25). The ALJ further noted that Dr. Brisson failed to provide a function-by-function assessment "but it can be assumed that the claimant would not be able to return to medium exertional work based on his assessment" (Tr. 25).

The ALJ gave great weight to Dr. Corvalan's opinion because he was an examining source and his opinion was "largely consistent" with the medical evidence and his own clinical findings (Tr. 25).

The ALJ afforded Dr. Bhanusali's opinion only some weight (Tr. 25). Although Dr. Bhanusali was an examining source,

the ALJ noted that his conclusion regarding "the preclusion of postural positions [was] not supported by his own clinical findings," and it was also contradicted by Dr. Hendler's report and Drs. Corvalan's and Dr. Seigel's examinations (Tr. 25). The ALJ noted that Dr. Bhanusali's examination showed that plaintiff had mild tenderness and "largely normal or slightly decreased range of motion in her shoulders and knees, which would support at least occasional postural activities" (Tr. 25).

The ALJ afforded Dr. Wright's opinion that plaintiff was "'temporarily totally disabled'" little weight because it was "vague and nonspecific" (Tr. 25). The ALJ noted that "although there is agreement that [plaintiff] cannot do her past work which is medium exertion, it appears that Dr. Wright does not preclude other work" (Tr. 24).

The ALJ's opinion did not consider Dr. Bachar or her findings.

Next, the ALJ found that plaintiff was not credible. He found that although plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were not credible (Tr. 17). First, the ALJ noted that plaintiff's description of her daily activities was "not limited to the extent one would expect, given

the complaints of disabling symptoms and limitations" (Tr. 24).
The ALJ found it significant that plaintiff lived alone, cared
for two dogs, traveled by air to Puerto Rico, performed household
chores such as cleaning, cooking and grocery shopping and drove a
car (Tr. 24). He noted that "[w]hen assessing her level of
activities, it is not unreasonable that such a person would be
able to sustain at least a full range of light exertional work
with some additional non exertional limitations as set out in the
[RFC]" (Tr. 24).

Second, the ALJ stated that the various surgeries
plaintiff underwent "appear to have achieved their intended
results" (Tr. 24). Additionally, the ALJ noted that plaintiff
treated her pain primarily by taking over-the-counter medication,
and that any medication plaintiff took "would not prevent her
from engaging in a range of light exertional work" (Tr. 24).

Third, the ALJ noted that although Dr. Wright's opinion
may have supported plaintiff's claims, his opinion was vague and
non-specific (Tr. 24).

Fourth, the ALJ stated that plaintiff's $1.2 million
settlement and monthly pension "raise[] a question as to whether
[plaintiff's] continuing unemployment is actually due to medical
impairments or her desire not to search for work within her [RFC]
due to her financial condition" (Tr. 25).

60

Fifth, the ALJ noted that even on days when plaintiff's pain is most severe, "it appears that her pain has been generally in control as she testified that she has not sought treatment from a pain management specialist, and has been controlling her pain with over the counter medication" (Tr. 25). The ALJ went on to note that "[o]ne would reasonably expect if pain was so debilitating to affect one's activities of daily living on such a significant scale more aggressive treatment would be undertaken to control it" (Tr. 25).

Sixth, the ALJ found that there was no evidence that a cane was medically necessary (Tr. 24). Additionally, the ALJ noted that plaintiff's testimony that she could not reach out in front of her was contradicted by the independent medical examinations (Tr. 24).

At step four, the ALJ found that plaintiff was unable to perform her past relevant work as a police officer, which was medium-level work, because plaintiff was limited to a reduced range of light work (Tr. 26).

At step five, the ALJ found that jobs existed in significant numbers in the national economy that plaintiff could perform, given her age, education, work experience and RFC and the rules in the Grids (Tr. 26-27). The ALJ noted that if plaintiff had the RFC "to perform the full range of light work, a

finding of not disabled would be directed by Medical-Vocational

Rule 202.21" (Tr. 26 (internal quotation marks omitted)).

However, plaintiff's "ability to perform all or substantially all

of the requirements of this level of work has been impeded by

additional limitations" (Tr. 27). Citing the vocational expert's

testimony, the ALJ found that plaintiff would be able to perform

the requirements of representative occupations such as dental

floss packer, office helper, file clerk and collator operator

(Tr. 27). Accordingly, the ALJ found that plaintiff was not

disabled (Tr. 27).

## C. Analysis of the ALJ's Decision

Plaintiff contends that the ALJ committed legal error

and that his decision was not supported by substantial evidence

(Plaintiff's Memorandum of Law in Support of her Motion for

Judgment on the Pleadings, dated Dec. 5, 2016 (D.I. 13) ("Pl.'s

Mem."), at 15-19). Plaintiff claims that the ALJ deprived her of

a full and fair hearing, improperly weighed the medical opinion

evidence, improperly assessed her credibility and improperly

interpreted the testimony of the vocational expert (Pl.'s Mem.,

at 15-19). Plaintiff also argues that the ALJ's analysis at step
five was inconsistent with his RFC assessment (Pl.'s Mem., at 15-
17).

As described above, the ALJ went through the sequential
process required by the regulations. The ALJ's analysis at steps
one and two were decided in plaintiff's favor, and the Commis-
sioner has not challenged those findings. The ALJ's analysis at
step three was decided in the Commissioner's favor, and plaintiff
has not challenged that finding. I shall, therefore, limit my
discussion to whether the ALJ provided plaintiff with a full and
fair hearing and whether his analysis at steps four and five
complied with the applicable legal standards and was supported by
substantial evidence.

### 1. ALJ's Conduct
### During the Hearing

Plaintiff contends that the ALJ did not provide a full
and fair hearing as a result of his conduct during the hearing.
First, plaintiff claims that the ALJ was biased and displayed
animosity toward plaintiff's attorney, as demonstrated by the
following exchange that occurred after plaintiff requested to
stand and stretch while testifying (Pl.'s Mem., at 18):

> ALJ: Yeah. All of [plaintiff's counsel's] clients
> stand, so --

ATTY: That's not true.

ALJ: -- it's not a problem. He knows.

CLMT: Oh, I'm sorry --

ALJ: But he knows. But you know that's always okay.

ATTY: That is totally not true.

ALJ: Almost all of them.

ATTY: I'm sure you're biased against me.

ALJ: No, not me. No. But if you need to sit, stand at will --

CLMT: Because I was this [phonetic] --

ALJ: Yeah, yeah. No, it's okay. Whatever you need, up and down, it's not a problem. Anytime, anytime, okay.

(Tr. 50).

Plaintiff has not demonstrated that the ALJ exhibited a "deep-seated favoritism or antagonism that would make fair judgment impossible," Liteky v. United States, supra, 510 U.S. at 555, or that the ALJ's decision was the product of bias. At most, the ALJ made a stray remark, which is insufficient for a finding of bias. See Brogan v. Commissioner of Soc. Sec., 671 F. App'x 12, 13 (2d Cir. 2016) (summary order) ("[W]e are not persuaded that . . . stray remarks [critical of the claimant's counsel] -- though ill-advised -- manifest a deep-seated favoritism or antagonism that would make a fair judgment impossible." (internal quotation marks omitted)).

Second, plaintiff contends that the ALJ repeatedly interrupted her attorney during his questioning of plaintiff and the vocational expert (Pl.'s Mem., at 19). However, this did not deprive plaintiff of a full and fair hearing, either. "Presentation and reception of evidence is left to the ALJ's broad discretion." Brogan v. Commissioner of Soc. Sec., supra, 671 F. App'x at 14; see 20 C.F.R. § 404.950(c). Nor was plaintiff prejudiced by the ALJ's interruptions. ALJ Gonzalez made sure that plaintiff's counsel exhausted his inquiry of plaintiff and the vocational expert (Tr. 63, 100-01).[62]

Thus, the ALJ's conduct did not deprive plaintiff of a full and fair hearing.

## 2. Weighing of Opinion Evidence

Plaintiff also argues that the ALJ erred in (1) failing to give Dr. Wright's opinion controlling weight, (2) failing to consider Dr. Bachar's opinion and findings and (3) failing to

---

[62]Plaintiff also takes issue with the answers the vocational expert provided to her attorney's questioning. Specifically, plaintiff bemoans the fact that, in response to a hypothetical from plaintiff's counsel about occasional reaching, the expert sought to clarify the degree of reaching that could be done; however, in response to a hypothetical from the ALJ about frequent reaching, the expert did not seek to clarify the degree of reaching (Pl.'s Mem., at 19). This quibble does not support a finding that plaintiff was denied a full and fair hearing.

recognize "the many positive findings made by Dr. Brisson" (Pl.'s
Mem., at 16). The Commissioner, on the other hand, argues that
all three physicians are not entitled to controlling weight
because they opined on the ultimate issue of disability, which is
reserved for the Commissioner, and did not provide a functional
assessment (Memorandum of Law in Support of Defendant's Motion
for Judgment on the Pleadings and in Opposition to Plaintiff's
Motion for Judgment on the Pleadings, dated Feb. 3, 2016 (D.I.
15) ("Def.'s Mem."), at 19-21). Thus, the Commissioner argues
that any legal error in weighing their opinions was harmless
(Def.'s Mem., at 19-21).

As noted above, see Section III.A.4, supra, the ALJ
must give deference to the opinions of a claimant's treating
physician. The ALJ did not err in this regard with respect to
Dr. Brisson; the ALJ afforded great weight to his opinion. The
ALJ did, however, err in this regard with respect to both Drs.
Wright and Bachar.

First, before deciding to give Dr. Wright's opinion
less than controlling weight, the ALJ was required to consider
(1) the length of the treatment relationship and the frequency of
examination, (2) the nature and extent of the treatment relation-
ship, (3) the medical support for Dr. Wright's opinion, (4) the
consistency of his opinion with the record as a whole, (5) Dr.

Wright's level of specialization in the area and (6) other
factors that tend to support or contradict Dr. Wright's opinion.
20 C.F.R. § 404.1527(c)(2)-(6); see Schisler v. Sullivan, supra,
3 F.3d at 567; Mitchell v. Astrue, supra, 2009 WL 3096717 at *16;
Matovic v. Chater, supra, 1996 WL 11791 at *4. Although a
"slavish recitation of each and every factor" is not required
"where the ALJ's reasoning and adherence to the regulation are
clear," Atwater v. Astrue, supra, 512 F. App'x at 70, here the
ALJ's reasoning and adherence to the regulation are not clear.
The ALJ only expressly considered the vagueness of Dr. Wright's
opinion, and it is not clear whether he considered the other
factors identified above. "Bluntly, the ALJ utterly failed to
articulate the kind of reasons the regulations and case law
require before deciding not to give [Dr. Wright's] opinion[]
controlling weight." Smith v. Colvin, 218 F. Supp. 3d 168, 174
(E.D.N.Y. 2016); see Agapito v. Colvin, 12 Civ. 2108 (PAC)(HBP),
2014 WL 774689 at *19 (S.D.N.Y. Feb. 20, 2014) (Crotty, D.J.)
(the ALJ "appears to have rejected [the treating physician's]
opinion in the summary fashion that the treating physician rule
is designed to prevent"); Ellington v. Astrue, supra, 641 F.
Supp. 2d at 331 ("The requirement that the ALJ give specific
reasons for his determination is more than just a bureaucratic

box to check; it is an important aspect of achieving a just result in disability cases.").

Second, the ALJ utterly failed to consider Dr. Bachar's findings. This was erroneous because Dr. Bachar was a treating source.[63] The regulations define a treating source as

> [the claimant's] own acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]. Generally, we will consider that [the claimant] ha[s] an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that [the claimant] see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s). We may consider an acceptable medical source who has treated or evaluated [the claimant] only a few times or only after long intervals (e.g., twice a year) to be [the claimant's] treating source if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition(s).

20 C.F.R. § 1527(a)(2). A physician who has examined a claimant on one or two occasions is generally not considered a treating physician. See 20 C.F.R. § 404.1527(a)(2); see also Shatraw v. Astrue, supra, 2008 WL 4517811 at *10 ("Doctors who see a patient only once do not have a chance to develop an ongoing relationship

---

[63]A court is permitted to determine whether a physician is a treating source in the first instance. See Hall v. Colvin, 37 F. Supp. 3d 614, 625 (W.D.N.Y. 2014); Shatraw v. Astrue, No. 7:04-CV-0510 (NAM/RFT), 2008 WL 4517811 at *11 (N.D.N.Y. Sept. 30, 2008).

with the patient, and therefore are not generally considered treating physicians."), citing Snell v. Apfel, supra, 177 F.3d at 133 and Schisler v. Bowen, 851 F.2d 43, 45 (2d Cir. 1988); accord Garcia v. Barnhart, 01 Civ. 8300 (GEL), 2003 WL 68040 at *5 n.4 (S.D.N.Y. Jan. 7, 2003) (Lynch, then D.J., now Cir. J.). There is, however, no minimum number of visits required to establish a treating physician relationship; instead, the court's focus should be on the nature of the relationship. Vasquez v. Colvin, 14 Civ. 7194 (JLC), 2015 WL 4399685 at *20 (S.D.N.Y. July 20, 2015) (Cott, M.J.); Fratello v. Colvin, 13 Civ. 4339 (VSB)(JLC), 2014 WL 4207590 at *11 (S.D.N.Y. Aug. 26, 2014) (Cott, M.J.) (Report & Recommendation), adopted sub nom. by, Fratello v. Commissioner of Soc. Sec., 2014 WL 5091949 (S.D.N.Y. Oct. 9, 2014) (Broderick, D.J.); see Schisler v. Bowen, supra, 851 F.2d at 45.

Dr. Bachar can be considered a treating source. The first time Dr. Bachar saw plaintiff was on April 9, 2013. On that date, Dr. Bachar wrote an EMG report, which noted that she was the physician who referred plaintiff for the EMG (Tr. 344-45). Dr. Bachar also noted plaintiff's medical history and the results of the EMG and a physical examination (Tr. 344-45). Dr. Bachar then saw plaintiff two more times, on May 30 and July 2, 2013 (Tr. 338-39). During those appointments, Dr. Bachar exam-

69

ined and diagnosed plaintiff and prescribed medication (Tr. 338-39). These visits are sufficient to establish a treating relationship with Dr. Bachar, however brief it may have been. See, e.g., Snell v. Apfel, supra, 177 F.3d at 130, 133 (three visits to a physician established treating relationship); Harrison v. Secretary of Health & Human Servs., 901 F. Supp. 749, 755 (S.D.N.Y. 1995) (Schwartz, D.J.) (finding treating relationship where doctor examined patient at least four times over five months, diagnosed the claimant and referred her for various tests and treatment). Because Dr. Bachar was a treating source, the ALJ was required to, at least, address her opinions. See Snell v. Apfel, supra, 177 F.3d at 134 ("Reserving the ultimate issue of disability to the Commissioner relieves the [SSA] of having to credit a doctor's finding of disability, but it does not exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited."); Barrett v. Colvin, 211 F. Supp. 3d 567, 581-82 (W.D.N.Y. 2016).

Contrary to the Commissioner's arguments, the failure to consider properly Dr. Wright's and Dr. Bachar's opinions was not harmless precisely because these physicians failed to provide a functional assessment. As explained further below, under these

70

circumstances, the ALJ was required to seek a functional assessment from them.

### 3. Development of
   the Record

The Commissioner's regulations provide that the SSA "will request a medical source statement about what [the claimant] can still do despite [her] impairment(s)." 20 C.F.R. § 404.1513(b)(6) (2015)[64] (emphasis added). Although "[t]he regulation thus seems to impose on the ALJ a duty to solicit such medical opinions," an ALJ's failure to obtain a medical source statement from a treating physician before making his disability determination is not a per se error that invariably requires remand. Tankisi v. Commissioner of Soc. Sec., 521 F. App'x 29, 33-34 (2d Cir. 2013) (summary order); see Swiantek v. Commissioner of Soc. Sec., supra, 588 F. App'x at 84; Pellam v. Astrue, 508 F. App'x 87, 89-90 (2d Cir. 2013) (summary order); see also 20 C.F.R. § 404.1513(b)(6) (2015) ("[T]he lack of the medical

---

[64]On March 27, 2017, Section 404.1513 was modified and the language quoted in the text was deleted. The following language was also deleted: "Although we will request a medical source statement about what you can still do despite your impairment(s), the lack of the medical source statement will not make the report incomplete." Because the ALJ adjudicated plaintiff's claim before that date, the revised section does not apply here. See Lowry v. Astrue, supra, 474 F. App'x at 804 n.2.

source statement will not make the report incomplete."). Rather, the need for a medical source statement from the treating physician hinges on the "circumstances of the particular case, the comprehensiveness of the administrative record, and, at core, whether an ALJ could reach an informed decision based on the record." Sanchez v. Colvin, 13 Civ. 6303 (PAE), 2015 WL 736102 at *5 (S.D.N.Y. Feb. 20, 2015) (Engelmayer, D.J.), citing Tankisi v. Commissioner of Soc. Sec., supra, 521 F. App'x at 33-34. One important consideration in examining the sufficiency of the record is whether the treating physician assessed the claimant's limitations. As explained in DeLeon v. Colvin, No. 3:15-CV-01106 (JCH), 2016 WL 3211419 at *4 (D. Conn. June 9, 2016),

> Often, Records that are deemed to be complete without a medical source statement from a treating physician contain notes that express the treating physician's views as to a claimant's residual functional capacity, i.e., the treating physicians' views can be divined from their notes, and it is only a formal statement of opinion that is missing from the Record. See, e.g., Tankisi, 521 F. App'x at 34 (declining to remand on the basis of the ALJ's failure to obtain a formal opinion from a treating physician and noting that "although [the medical record] does not contain formal opinions on Tankisi's RFC from her treating physicians, it does include an assessment of Tankisi's limitations from a treating physician"); Whipple v. Astrue, 479 F. App'x 367, 370 (2d Cir. 2012) (noting that "[t]he ALJ had comprehensive medical notes from Dr. Roger Levine, Whipple's treating physician . . . [that] observed that

> Whipple was capable of working and that Whipple's
> depression and anxiety were manageable with medica-
> tion").

(Alterations in original); see Dennis v. Colvin, 195 F. Supp. 3d
469, 474 (W.D.N.Y. 2016) ("[I]t is not sufficient for the ALJ
simply to secure raw data from the treating physician. What is
valuable about the perspective of the treating physician -- what
distinguishes him from the examining physician and from the ALJ -
- is his opportunity to develop an informed opinion as to the
physical status of a patient." (alteration and emphasis in
original)), quoting Peed v. Sullivan, 778 F. Supp. 1241, 1246
(E.D.N.Y. 1991); Downes v. Colvin, 14 Civ. 7147 (JLC), 2015 WL
4481088 at *10 (S.D.N.Y. July 22, 2015) (Cott, M.J.) ("Because
[t]he expert opinions of a treating physician as to the existence
of a disability are binding on the fact finder, it is not suffi-
cient for the ALJ simply to secure raw data from the treating
physician." (alteration in original; internal quotation marks
omitted)); Sanchez v. Colvin, supra, 2015 WL 736102 at *6;
Swanson v. Colvin, No. 12-CV-645S, 2013 WL 5676028 at *5 (W.D.N.-
Y. Oct. 17, 2013).

Here, neither Dr. Wright nor Dr. Bachar assessed
plaintiff's limitations and their treatment notes do not address

them directly or by implication.[65] Although these physicians made findings on plaintiff's sensation, range of motion, strength and gait, for example, such findings do not shed any light on the limitations the ALJ identified. In other words, from Dr. Wright-'s and Dr. Bachar's findings, it is impossible to assess whether plaintiff could lift up to 20 pounds at a time or frequently lift or carry up to 10 pounds, as required by light work, 20 C.F.R. § 404.1567(b), or how often she could walk, stand, sit, push, pull, handle, reach overhead, crouch, stoop, kneel, climb stairs and flex, extend and rotate her neck. See Morales v. Colvin, No. 3:16-cv-0003 (WIG), 2017 WL 462626 at *2 (D. Conn. Feb. 3, 2017) ("[T]hese [treatment] notes do not (nor would one expect they should) reflect Plaintiff's limitations, particularly as to how her conditions, in combination, affect her ability to work on a sustained basis."); Manchester v. Colvin, No. 7:13-CV-00308, 2014 WL 4983496 at *5 (N.D.N.Y. Oct. 6, 2014) ("[A]lthough the ALJ's written decision includes a narrative discussion of the raw

_____

[65]The SSA requested Dr. Wright to complete a medical report assessing plaintiff's limitations, but he failed to complete it (Tr. 288-94). However, nowhere in his decision does the ALJ note that he ever attempted to obtain this report. See Legall v. Colvin, 13 Civ. 1426 (VB), 2014 WL 4494753 at *5 (S.D.N.Y. Sept. 10, 2014) (Briccetti, D.J.) (ALJ's duty to develop was not satisfied where no opinion was provided regarding functional limitations, plaintiff's counsel failed to provide an RFC assessment despite a request from the ALJ and the ALJ did not seek one himself).

medical data contained in plaintiff's medical records, such information is not an acceptable basis for making an RFC finding in the absence of a supporting expert medical opinion.").

The opinions of Drs. Brisson, Corvalan, Hendler, Seigel and Bhanusali do not make up for these deficiencies in the record. Dr. Brisson also failed to provide a functional assessment. Although he noted that plaintiff's neck movement was "still slightly apprehensive" (Tr. 369-70), which would bear on her ability to flex, extend and rotate her neck, Dr. Brisson noted such findings only during two appointments over the span of a two-year treatment relationship, which is a far cry from a comprehensive record. Cf. Laing v. Commissioner of Soc. Sec., 15 Civ. 7764 (HBP), 2017 WL 934715 at *16 (S.D.N.Y. Mar. 9, 2017) (Pitman, M.J.) (claimant's limitations could be inferred from treating physician's notes during five mental status evaluations over eight-month period). Thus, like Drs. Wright and Bachar, plaintiff's limitations cannot be divined from Dr. Brisson's treatment notes.

Dr. Corvalan does not fill the gap either. He examined plaintiff on one occasion and did not have the benefit of plaintiff's complete medical record. "Opinions from a one-time consultative physician are not ordinarily entitled to significant weight, in particular where that physician does not have the

benefit of the complete medical record." Duran v. Colvin, 14 Civ. 8677 (HBP), 2016 WL 5369481 at *18 (S.D.N.Y. Sept. 26, 2016) (Pitman, M.J.); see Selian v. Astrue, supra, 708 F.3d at 419 ("We have previously cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination."); Tarsia v. Astrue, 418 F. App'x 16, 18 (2d Cir. 2011) (summary order) ("Because it is unclear whether [the consulting physician] reviewed all of [the claimant's] relevant medical information, his opinion is not 'supported by evidence of record' as required to override the opinion of [the] treating physician . . . ."). Additionally, Dr. Corvalan vaguely described plaintiff as having mild or moderate limitations (Tr. 298-99). Such statements "cannot serve as an adequate basis for determining plaintiff's RFC" because they "did not provide enough information to allow the ALJ to make the necessary inference that Plaintiff could perform [light] work." Hilsdorf v. Commissioner of Soc. Sec., 724 F. Supp. 2d 330, 347-48 (E.D.N.Y. 2010) (footnote omitted); see Selian v. Astrue, supra, 708 F.3d at 421 (ALJ's RFC determination not supported by substantial evidence when she relied on "remarkably vague" opinion of consulting physician; "[w]hat [the consulting physician] means by 'mild degree' and 'intermittent' is left to the ALJ's sheer speculation . . . . [The consulting physician's] opinion does not

76

provide substantial evidence to support the ALJ's finding that [the claimant] could lift 20 pounds occasionally and 10 pounds frequently." (citations omitted)); Paz v. Commissioner of Soc. Sec., supra, 2016 WL 1306534 at *17.

Drs. Hendler and Seigel do not fill this lacuna either. Although an assessment of plaintiff's limitations can be divined from Dr. Hendler's notes because he reported normal findings, and an assessment can be partially divined from Dr. Seigel's report,[66] both physicians examined plaintiff only one time, and it is not clear whether they had the benefit of plaintiff's complete medical record. The earliest medical evidence Drs. Hendler and Seigel referenced was a treatment note from Dr. Wright dated May 31, 2013 (Tr. 448, 460), and, thus, it does not appear that either doctor had medical records before that date.

Finally, Dr. Bhanusali does not fill the gap. He also examined plaintiff only one time, in 2012 (Tr. 531) and, thus, could not have had the benefit of plaintiff's medical records after her 2013 car accident. Although Dr. Bhanusali assessed plaintiff's functional limitations and opined that plaintiff could perform modified work without lifting more than 15 pounds

---

[66]Specifically, Dr. Seigel found that plaintiff's grip strength was strong (Tr. 457), which would inform the ALJ's finding on her ability to handle objects.

and that plaintiff should avoid overhead activities with the left shoulder and bending, pushing, pulling, squatting, kneeling and strenuous physical activities (Tr. 538), the ALJ gave his opinion only some weight.[67]

Therefore, not only did the ALJ violate the treating physician rule, he also failed in his duty to develop the record to obtain sufficient evidence from which the ALJ could fully consider plaintiff's residual functional capacity. See Tankisi v. Commissioner of Soc. Sec., supra, 521 F. App'x at 34. These legal errors in the ALJ's process require remand. See Morgan v. Colvin, supra, 592 F. App'x at 50-51; Rosa v. Callahan, supra, 168 F.3d at 79-80; Elliott v. Colvin, No. 13-CV-2673 (MKB), 2014 WL 4793452 at *17-*18 (E.D.N.Y. Sept. 24, 2014) (collecting cases); see also Lacava v. Astrue, 11 Civ. 7727 (WHP)(SN), 2012 WL 6621731 at *16-*17 (S.D.N.Y. Nov. 27, 2012) (Netburn, M.J.) (Report & Recommendation), adopted by, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012) (Pauley, D.J.).

---

[67]The ALJ gave Dr. Bhanusali's opinion some weight because "the preclusion of postural positions is not supported by his own clinical findings" and it contrasted with Dr. Hendler's report and Drs. Corvalan's and Seigel's examinations (Tr. 25). Yet, the ALJ did not specify what portion of Dr. Bhanusali's opinion was given "some weight." It is unclear whether the ALJ gave all of Dr. Bhanusali's opinions some weight or whether the ALJ gave only Dr. Bhanusali's opinion on plaintiff's postural activities some weight.

## 4. Evaluation of
### Plaintiff's Credibility

Plaintiff also argues that the ALJ did not properly assess her credibility (Pl.'s Mem., at 19). Although the legal errors identified above, by themselves, are sufficient to warrant remand, I make the following observations to ensure that the ALJ properly complies with the applicable legal principles on remand.

As noted above, the ALJ found that although plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible (Tr. 17). The ALJ found that plaintiff was not credible because (1) plaintiff's settlement and monthly pension raised a question as to whether her continued unemployment was due to a desire not to seek work; (2) her daily activities contradicted her complaints of pain; (3) her various surgeries achieved their intended results; (4) plaintiff's medication would not preclude her from performing light exertional work; (5) Dr. Wright's opinion, which may have supported plaintiff's testimony, was vague and non-specific; (6) plaintiff was able to control her pain with over-the-counter medication and "[o]ne would reasonably expect if pain was so debilitating to affect one's activities of

daily living on such a significant scale more aggressive treat-
ment would be undertaken to control it" and (7) there was no
evidence that a cane was medically necessary and plaintiff's
contention that she could not reach out in front of her was
contradicted by the independent medical examinations (Tr. 24-25).

### a. Consideration of
### Plaintiff's Pension

With respect to plaintiff's monthly pension, "judges
within this Circuit have found the use of other sources of income
to make an adverse credibility determination improper." Cordero
v. Astrue, 11 Civ. 5020 (PAE)(HBP), 2013 WL 3879727 at *26
(S.D.N.Y. July 29, 2013) (Engelmayer, D.J.) (collecting cases);
see Silvio v. Colvin, No. 14 Civ. 10035 (JPO), 2016 WL 3369618 at
*4 (S.D.N.Y. June 16, 2016) (Oetken, D.J.) ("[T]he fact that a
disability claimant has other sources of income does not, on its
own, undermine the credibility of her testimony concerning the
pain, suffering, and limitations resulting from her impair-
ment."). However, such an error, standing alone, would not
require remand as long as the ALJ's credibility determination was
independently supported by other substantial evidence. Cordero
v. Astrue, supra, 2013 WL 3879727 at *26.

However, as explained below, the ALJ's credibility assessment was also flawed because he selectively relied on evidence.

### b. Selective Reliance on Evidence

"'[T]he ALJ selectively relied on evidence that weighed against a finding of a disability. This is improper -- an ALJ may not "pick and choose evidence which favors a finding that the claimant is not disabled."'" Clarke v. Colvin, 15 Civ. 354 (KBF), 2017 WL 1215362 at *9 (S.D.N.Y. Apr. 3, 2017) (Forrest, D.J.), quoting Rodriguez v. Astrue, 07 Civ. 534 (WHP)(MHD), 2009 WL 637154 at *25 (S.D.N.Y. Mar. 9, 2009) (Pauley, D.J.); accord Meadors v. Astrue, 370 F. App'x 179, 185 n.2 (2d Cir. 2010) (summary order) (the ALJ "cannot simply selectively choose evidence in the record that supports his conclusions" (internal quotation marks omitted)); Kebreau v. Astrue, No. 11 CV 13 (RJD), 2012 WL 3597377 at *2 (E.D.N.Y. Aug. 20, 2012); Cruz v. Barnhart, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004) (Berman, D.J.). The ALJ did this in at least four places: (1) in his description of plaintiff's activities of daily living; (2) in his description of plaintiff's surgeries; (3) in his description of the effects of

plaintiff's medication and (4) in his description of plaintiff's pain management treatment.

First, although plaintiff did testify that she was able to live alone, take care of two dogs, travel to Puerto Rico, drive and perform chores, the ALJ ignored other testimony that would support plaintiff's claimed limitations. For example, plaintiff testified that she let her dogs out in the backyard instead of walking them (Tr. 50). Additionally, plaintiff testified that she could not drive for 90 minutes without taking a break (Tr. 58-59). Plaintiff also testified that she needed to hold pots with two hands because her right hand gave way (Tr. 56-57, 70-71).[68]

Second, contrary to the ALJ's assertion, plaintiff's various surgeries did not completely achieve their intended results, especially with respect to her cervical spine and left knee. For example, even after the micro-discectomy fusion in May

---

[68]Additionally, "there is no evidence that [plaintiff] engaged in any of these activities for sustained periods comparable to those required" by light work. Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (internal quotation marks omitted); accord Alfaro v. Colvin, No. 14-CV-04392, 2015 WL 4600654 at *11 (E.D.N.Y. July 29, 2015) ("[T]he ALJ erred in concluding that evidence of carrying on basic activities that do not require continuous sitting or standing showed [the claimant] could meet the requirements of sedentary work."), citing Balsamo v. Chater, supra, 142 F.3d at 81; Glessing v. Commissioner of Soc. Sec., No. 13 Civ. 1254 (BMC), 2014 WL 1599944 at *11 (E.D.N.Y. Apr. 21, 2014).

82

2011, plaintiff was diagnosed with cervical radiculopathy, cervicalgia and a cervical sprain (Tr. 324, 327, 338-39, 457). Similarly, after an arthroscopy was performed on plaintiff's left knee in January 2012, Dr. Corvalan noted that plaintiff was not able to walk on her heels and toes because of knee pain during his examination (Tr. 296). There was also tenderness and swelling in the knee during that examination (Tr. 298). On July 18, 2013, Dr. Wright reported that plaintiff's knee remained "significantly painful" (Tr. 320), and an MRI taken in 2013 showed osteoarthritis, a tear of the medial meniscus, anterior cruciate ligament scarring, a "medial collateral ligament sprain, medial retinacular sprain" and joint effusion (Tr. 314-15). In March 2014, plaintiff started additional knee exercises in physical therapy because of knee pain and locking (Tr. 494). The physical therapist even noted that plaintiff's ability to walk was limited and that she could not kneel (Tr. 501, 509). Her physical therapist also noted that there was tenderness, swelling and edema in the knee, although some of those symptoms were alleviated the next month (Tr. 509, 512, 516, 526, 456).

Third, in stating "[t]he type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms would not prevent her from engaging in a range of light exertional work" (Tr. 24) and

83

that "[o]ne would reasonably expect if pain was so debilitating to affect one's activities of daily living on such a significant scale more aggressive treatment would be undertaken to control it," such as by seeing a pain management specialist (Tr. 25), the ALJ ignored plaintiff's testimony that she sometimes took as many as 20 pills of Advil a day and hydrocodone four times a month (Tr. 45, 47-48). The ALJ also ignored evidence that plaintiff was prescribed Percocet in the past (Tr. 338-39, 346).

Thus, the ALJ should reconsider his credibility assessment in light of the standards set forth above.

### 5. Substantial Evidence

Because the ALJ's failure to consider properly the opinions of Drs. Wright and Bachar and to discharge his duty to develop the record warrants remand, I do not address whether the ALJ's opinion regarding plaintiff's RFC was supported by substantial evidence, see Lacava v. Astrue, supra, 2012 WL 6621731 at *11 ("These errors render the record incomplete and the Court unable to evaluate the final agency determination."), nor do I address plaintiff's remaining arguments.

84

IV.  Conclusion

        Accordingly, for all the foregoing reasons, plaintiff's

motion for judgment on the pleadings is granted.  The Commis-

sioner's motion is denied, and this case is remanded to the SSA

for further proceedings.  The Clerk of the Court is respectfully

requested to close Docket Items 12 and 14.

Dated:  New York, New York
        August 11, 2017

                                SO ORDERED

                                HENRY PITMAN
                                United States Magistrate Judge

Copies transmitted to:

All Counsel of Record